T4EEMCDH

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,                New York, N.Y.

 4              v.                            15 CR 233(PGG)

 5   JAMES McDOW,

 6                  Defendant.

 7   ------------------------------x

 8
                                             April 14, 2016
 9                                           2:34 p.m.

10
     Before:
11
                     HON. PAUL G. GARDEPHE,
12
                                             District Judge
13

14                      APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     BY:  GINA CASTELLANO
17        RICHARD COOPER
          Assistant United States Attorneys
18
     KENNETH PAUL
19        Attorney for Defendant

20   ALSO PRESENT:
          Brandon DeShields, paralegal
21        Kelly Ziegler, Special Agent, Homeland Security

22

23

24

25

1            (Case called)

2            THE DEPUTY CLERK:  Is the government ready?

3            MS. CASTELLANO:  Good afternoon, your Honor.  Gina

4     Castellano and Richard Cooper for the government.  We're joined

5     by Brendan Deshields, a paralegal specialist in our office, and

6     Kelly Ziegler, Special Agent with Homeland Security.

7            MR. COOPER:  Good afternoon, your Honor.

8            MR. PAUL:  Good afternoon, your Honor.  Kenneth Paul

9     for James McDow.

10           THE COURT:  Good afternoon.

11           Ms. Castellano, are you prepared to proceed?

12           MS. CASTELLANO:  Yes, your Honor.  We're ready to call

13    our first witness.

14           THE COURT:  All right.

15     BRANDON GEMBECKI,

16         called as a witness by the Government,

17         having been duly sworn, testified as follows:

18    DIRECT EXAMINATION

19    BY MS. CASTELLANO:

20    Q.  Good afternoon, Officer Gembecki.  Who do you work for?

21    A.  New York City Police Department.

22    Q.  What is your title?

23    A.  Police officer.

24    Q.  Where do you work?

25    A.  In the 52nd precinct.

1    Q.  Where is the 52nd precinct located?

2    A.  It's located in the Bronx, New York.

3    Q.  Officer Gembecki, how long have you been a police officer?

4    A.  Approximately six years.

5    Q.  What's your current assignment at the 52nd precinct?

6    A.  I'm currently assigned to anticrime.

7    Q.  What was your assignment in August of 2014?

8    A.  I was assigned to a conditions team.

9    Q.  Was that at the 52nd precinct as well?

10   A.  Yes, it was.

11   Q.  What are conditions?

12   A.  Conditions team, we address conditions that are occurring

13   in our precinct, whether it be robberies, drug sales, drug use,

14   burglaries.

15   Q.  By August 2014 approximately how many arrests had you been

16   involved in?

17   A.  A couple hundred.

18   Q.  And of those couple hundred, approximately how many were

19   narcotics arrests?

20   A.  I would say 175 approximately.

21   Q.  Since August 2014, approximately how many arrests have you

22   been involved in?

23   A.  Over 100.

24   Q.  How many of those have been narcotics arrests?

25   A.  I'd say approximately half.

1    Q.  Officer Gembecki, are you familiar with Decatur Avenue

2    between East 193rd Street and Fordham Road?

3    A.  I am.

4    Q.  How are you familiar with that area?

5    A.  It's known to our precinct to be a narcotics-prone

6    location.

7    Q.  And why is it known to be a narcotics-prone location?

8    A.  My training and experience, I've been on patrol; I've been

9    on verticals in the buildings; I've answered 911 calls in those

10   buildings; I've seen crack pipes; I've seen needles, empty

11   needles in the building.  I went on a radio once of a male that

12   was apparently overdosed, and I had to call EMS for him.

13   Q.  Could you just describe briefly what a vertical is.

14   A.  I go inside a building, and you go upstairs and check the

15   building.

16   Q.  Thank you.

17           Officer Gembecki, directing your attention to

18   August 4, 2014.  Did you work that day?

19   A.  I did.

20   Q.  What were your scheduled work hours?

21   A.  It was 3:00 p.m. to 11:35 p.m.

22   Q.  Did you work with a partner?

23   A.  I did.

24   Q.  Who was that?

25   A.  It was Officer Kinane.

1   Q.  Had you worked with Officer Kinane before?

2   A.  I have.

3   Q.  Were you and Officer Kinane working in a vehicle that day?

4   A.  We were.

5   Q.  What type of vehicle?

6   A.  It was an unmarked New York City police vehicle.

7   Q.  What were you wearing that night?

8   A.  A police uniform.

9   Q.  What was Officer Kinane wearing?

10  A.  His police uniform.

11  Q.  And on August 4, 2014, while you were working, did there

12  come a time when you went to Decatur Avenue between East 193rd

13  Street and Fordham Road?

14  A.  There was.

15  Q.  Why did you decide to go on that block?

16  A.  It was a known narcotics-prone location.

17  Q.  Approximately what time did you arrive on that block?

18  A.  I would say approximately 5:45.

19  Q.  And where did you set up?

20  A.  We were on the corner of East 193rd Street and Decatur

21  Avenue.

22  Q.  Were you on the street or in a building?  Where were you?

23  A.  On the rooftop of a building.

24  Q.  Officer Gembecki, let me direct your attention to what's

25  been previously marked for identification purposes as

1   Government Exhibit 1.  Do you see that?

2   A.  I do.

3   Q.  Do you recognize it?

4   A.  I do.

5   Q.  What is it?

6   A.  It's a map of a portion of the 52nd precinct.

7   Q.  How do you know that?

8   A.  By the street names.

9           MS. CASTELLANO:  Your Honor, the government offers

10  Government Exhibit 1 into evidence.

11          THE COURT:  Any objection?

12          MR. PAUL:  No.

13          THE COURT:  Government Exhibit 1 is received.

14          (Government's Exhibit 1 received in evidence)

15          MS. CASTELLANO:  Your Honor, may I approach.

16          THE COURT:  You may.

17  BY MS. CASTELLANO:

18  Q.  I'm handing you a laser pointer.

19          Officer Gembecki, using Government Exhibit 1, can you

20  show the Court where you and your partner set up on August 4,

21  2014?

22          MS. CASTELLANO:  Let the record reflect that's the

23  southeast corner of Decatur Avenue and 193rd Street.

24          MR. PAUL:  I'm sorry.  I didn't see where he was

25  pointing.  Thank you.

G4EEMCDH                    Gembecki - direct

1    Q.  What, if anything, did you and Officer Kinane do on the

2    roof?

3    A.  Officer Kinane was observing the block on Decatur Avenue.

4    Q.  And again, using Government Exhibit 1, can you show the

5    Court the block that Officer Kinane was observing.

6    A.  (Indicating)

7    Q.  Is that Decatur Avenue between 193 and Fordham Road?

8    A.  That is.

9    Q.  Was Officer Kinane using anything to assist him?

10   A.  He was.

11   Q.  What was that?

12   A.  Binoculars.

13   Q.  What time of day was this?

14   A.  It was daylight.

15   Q.  What, if anything, were you doing on the roof?

16   A.  I was standing behind Officer Kinane to make sure nobody

17   else came up on the roof.

18   Q.  What, if anything, did Officer Kinane say to you on the

19   roof?

20   A.  He was speaking out loud -- there wasn't much

21   conversation -- with him speaking, giving descriptions of

22   individuals that were on the street.

23   Q.  Do you recall any of those descriptions?

24   A.  I do.  One was a male black, heavyset, wearing a white

25   T-shirt.  White, long-sleeve shirt.  I apologize.

1   Q.  And what, if anything else, did Officer Kinane say on the

2   roof?

3   A.  He said other descriptions of individuals that met with

4   that male, for a short, brief time, and left shortly

5   thereafter.

6   Q.  Do you recall how many meetings he described?

7   A.  I'd say approximately two.

8   Q.  Did you and Officer Kinane decide to leave the roof at some

9   time?

10  A.  We did.

11  Q.  Approximately how long were you on the roof?

12  A.  Approximately half-hour, 45 minutes.

13  Q.  When you left, where did you go?

14  A.  To Decatur Avenue between East Fordham Road and 193rd

15  Street.

16  Q.  Did you walk there or go in a car?

17  A.  In our vehicle.

18  Q.  And did you get out of your vehicle at some point?

19  A.  We did.

20  Q.  Did you speak to an individual?

21  A.  We did.

22  Q.  How did you decide which individual to speak to?

23  A.  Due to the description that Officer Kinane gave.  And also,

24  he pointed out the individual.

25  Q.  Do you see that individual sitting here in the courtroom

1   today?

2   A.  I do.

3   Q.  Can you describe where that individual is located in the

4   courtroom and an article of clothing he's wearing.

5   A.  He's at the back table wearing a black shirt.

6            MS. CASTELLANO:  May the record reflect that Officer

7   Gembecki has identified the defendant, James McDow.

8            THE COURT:  The record will so reflect.

9   Q.  Did you and Officer Kinane speak to the defendant on the

10  street?

11  A.  We did.

12           MS. CASTELLANO:  Your Honor, may I approach.

13           THE COURT:  Yes.

14  Q.  Officer Gembecki, I've handed you what's been previously

15  marked for identification purposes as Government Exhibit 2.  Do

16  you recognize that?

17  A.  I do.

18  Q.  What is it?

19  A.  It's a disk that I observed in the US Attorney's Office.

20  Q.  Does it include video of a portion of your encounter with

21  the defendant on August 4, 2014?

22  A.  It does.

23           MS. CASTELLANO:  Your Honor, the government offers

24  Government Exhibit 2 into evidence.

25           MR. PAUL:  No objection.

1          THE COURT:  Government Exhibit 2 is received.

2          (Government's Exhibit 2 received in evidence)

3          MR. PAUL:  Can I just see it for a second?

4          THE COURT:  Sure.

5          MS. CASTELLANO:  Your Honor, the government has an

6     exact copy of this CD which contains three videos ready to go

7     on the screen.  So for ease, we'd like to just play back,

8     instead of loading the CD.

9          THE COURT:  Any objection, Mr. Paul?

10          MR. PAUL:  No, your Honor.

11          THE COURT:  Admitted.

12          MS. CASTELLANO:  Thank you.

13          I'll just note for the Court that this is the video

14     without audio.  There is a version that does have audio.  It's

15     not audio of the actual encounter; it's a narration, we believe

16     done some time after the actual encounter.  We'll be playing

17     the one without audio.

18          THE COURT:  All right.  Could you lay a little more

19     foundation as to how this video came to be prepared?

20     BY MS. CASTELLANO:

21     Q.  Officer Gembecki, did you take this video?

22     A.  I did not.

23     Q.  Did you learn who did take this video?

24     A.  I did.

25     Q.  And how did you learn that?

G4EEMCDH                    Gembecki - direct

1    A.   By viewing it in US Attorney's Office.

2    Q.   And who do you believe took this video?

3    A.   Mr. McDow.

4    Q.   And why do you believe that?

5    A.   His voice.

6            MR. PAUL:  Could I have a further voir dire with

7    regard to this?

8            THE COURT:  Yes, you may.

9            MR. PAUL:  Thank you.

10   VOIR DIRE EXAMINATION

11   BY MR. PAUL:

12   Q.   Officer, you're not aware as to how this video was taped or

13   received by the government, is that right?

14   A.   That's correct.

15   Q.   Are you aware that the audio that you -- you listened to

16   the audio when you were watching the video; I assume, is that

17   right?

18   A.   That's correct.

19   Q.   So the audio that's on the video that we're not going to

20   listen to is the voice of who, as far as you can tell?

21   A.   Mr. McDow.

22   Q.   And you're aware that that's his voice from having

23   encountered him back in August of 2014?

24   A.   That's correct.

25   Q.   When you were shown this video, were you told as to the

1   source of the video, as to how the government came into its

2   possession?

3   A.  I was not.

4   Q.  Did the government have any discussions with you with

5   regard to the video, other than having you observe it and talk

6   to them with regard to what your recollection was concerning

7   the events?

8   A.  It seemed to me that it was just to refresh my memory of

9   the events.

10  Q.  And did it refresh your recollection as to the events?

11  A.  It did.

12  Q.  It's a video, is it not, taken from a camera fixed on one

13  of the buildings adjoining, if not the building, of 2559

14  Decatur; is that right?

15  A.  I'm not sure about that.

16  Q.  Well, it's a video depicting what's taking place in front

17  of 2559 when you encountered Mr. McDow, is that right?

18  A.  Yes.

19          MR. PAUL:  Thank you, Judge.  I have nothing further.

20  I have no objection to the video.

21          THE COURT:  All right.  Please proceed.

22          MS. CASTELLANO:  Thank you, your Honor.

23          Mr. DeShields, can you play the video from the

24  20-second mark and play it through to the 1:40 mark, please.

25          (Video played)

1           Thank you.

2    BY MS. CASTELLANO:

3    Q.   What street and sidewalk did this show?

4    A.   Decatur Avenue between East Fordham Road and East 193rd

5    Street.

6    Q.   Who's in the video?

7    A.   I see myself.  I see my partner, Officer Kinane.  And I see

8    Mr. McDow.

9    Q.   What's Mr. McDow wearing in the video?

10   A.   A white, long-sleeve shirt.

11   Q.   Are you standing in front of Mr. McDow or behind him?

12   A.   I'm standing in front of him.

13   Q.   Where is Officer Kinane standing?

14   A.   Directly behind him.

15   Q.   And were you talking to the defendant on that sidewalk?

16   A.   I was.

17   Q.   Do you recall what you said?

18   A.   I vaguely remember asking if he had anything on him he

19   shouldn't have.  I remember him being very nervous.  I remember

20   him asking us to go inside to get off the sidewalk.

21   Q.   Did you frisk the defendant on that sidewalk?

22   A.   Yes.

23   Q.   And at some point did you go into the lobby of the building

24   that you were standing in front of?

25   A.   We did.

1   Q.  Why did you go in there?

2   A.  Because Mr. McDow was asking us to.  We didn't want a

3   confrontation on the street.  There was other individuals on

4   the street that he was with.  We wanted to put him at ease.

5   Q.  How did you get into the building?

6   A.  He had a key.

7           MS. CASTELLANO:  Mr. DeShields, could you please

8   continue playing the video and play until the 3-minute,

9   8-second mark, please.

10          (Video played)

11  BY MS. CASTELLANO:

12  Q.  Officer Gembecki, could you describe the lobby of the

13  building that you entered.

14          THE COURT:  What was the address again of the

15  building?

16          MR. PAUL:  Sorry, Judge.  I didn't hear.

17          THE WITNESS:  I believe it was 2563 Decatur Avenue.

18          THE COURT:  I asked what the address was.  2563

19  Decatur?

20          THE WITNESS:  I believe so.

21          THE COURT:  Go ahead.

22          MS. CASTELLANO:  Thank you, your Honor.

23  BY MS. CASTELLANO:

24  Q.  Could you describe the lobby of that building.

25  A.  You go through a glass door.  It's a wide open lobby.

There's apartments on the first floor.  There's also a door in

the back to go out to the back of the building.  And there's

also stairs to go up to the rest of the apartments.

Q.  Mr. Gembecki, did the defendant make any statements in the

lobby of the building?

A.  He did.  He stated he had a couple of Bs and a couple of

crills on him.

Q.  And was this in response to any questioning?

A.  We asked him again if he had anything on he shouldn't have.

Q.  And what did you understand Bs to refer to?

A.  Bundles of heroin.

Q.  And crills?

A.  Crack cocaine.

Q.  Is that based on your training and experience?

A.  Yes.

Q.  Was the defendant handcuffed when he said he had a couple

of Bs and a couple of crills?

A.  He was not.

Q.  Was he restrained in any way?

A.  He was not.

Q.  Was he up against the wall?

A.  No, he was not.

Q.  What happened after the defendant said that he had a couple

of Bs and a couple of crills?

A.  He -- I'm not sure if he recovered it off his waistband or

1   I did, but a bundle was recovered from him.

2   Q.  A bundle of what?

3   A.  Heroin.

4   Q.  How did you know it was heroin?

5   A.  It was in glassine envelopes; brown, powdery substance in

6   it.

7   Q.  Did the defendant say anything else while you were in the

8   lobby?

9   A.  He did.  He was very nervous.  He was very adamant about

10  getting rid of his money.

11  Q.  And what, if anything, did you say to him regarding his

12  money?

13  A.  I said it was a lot of money.  It's not our protocol to do

14  it on the street.  And it would be coming back to the precinct

15  with us.

16  Q.  Officer Gembecki, when, if ever, did you handcuff the

17  defendant?

18  A.  After the narcotics was recovered.

19  Q.  Did you Mirandize him at that point?

20  A.  He was not.

21  Q.  Why not?

22  A.  It's not our protocol to do it on the street.  We stopped

23  asking questions.

24  Q.  What happened after you handcuffed the defendant?

25  A.  He was put in the back of our police car.

1   Q.  Approximately how long were you in the lobby?

2   A.  I would say approximately five to seven minutes.

3   Q.  And just to be clear, did you handcuff the defendant in the

4   lobby or on the street?

5   A.  In the lobby.

6   Q.  Did you go anywhere in the building other than the lobby?

7   A.  No, we did not.

8   Q.  You said you went to your police car after you handcuffed

9   the defendant.  Is that right?

10  A.  That's correct.

11          MS. CASTELLANO:  Mr. DeShields, can you play video

12  three on Government Exhibit 2, starting at the 1-minute and

13  47-second mark, please.

14          (Video played)

15          You can stop there.  Thank you.

16  Q.  Officer Gembecki, what does that video show?

17  A.  It shows myself, my partner and Mr. McDow walking out to

18  our police vehicle.

19  Q.  Where did you go in the car?

20  A.  The driver's seat.

21  Q.  And the defendant?

22  A.  Behind me in the rear.

23  Q.  And where was Officer Kinane seated?

24  A.  In the rear next to Mr. McDow.

25  Q.  And where, if anywhere, did you drive?

1    A.   We drove to the 52nd precinct.

2    Q.   While you were driving to the 52nd precinct, could you hear

3    whether the defendant and Officer Kinane were speaking in the

4    back seat?

5    A.   Yes.

6    Q.   Do you recall what Officer Kinane said?

7    A.   I recall Officer Kinane trying to calm Mr. McDow down.  He

8    was very upset.  I remember my partner saying, it's only a

9    bundle.  We'll try to get you a DAT.

10            I remember Mr. McDow saying, do you understand?  I

11   can't get a DAT.  I have a lot more.

12   Q.   Did you later learn that additional narcotics were

13   recovered from the defendant?

14   A.   I did.

15   Q.   How did you learn that?

16   A.   At the 52nd precinct from my partner.

17   Q.   Officer Gembecki, what is a DAT?  You just mentioned that.

18   A.   Desk appearance ticket.  That could be a court date, issued

19   from the 52nd precinct, if approved.

20   Q.   Before today had you seen the defendant since the day that

21   you arrested him?

22   A.   I have not.

23            MS. CASTELLANO:  Your Honor, may I have one moment,

24   please.

25            THE COURT:  Did you say that you obtained a bundle of

1   heroin from him; is that what you testified?

2            THE WITNESS:  It was approximately a bundle, correct.

3            THE COURT:  How many glassines is that?

4            THE WITNESS:  A bundle is considered ten.

5            THE COURT:  Okay.

6   BY MS. CASTELLANO:

7   Q.  Officer Gembecki, did the defendant say where he wanted to

8   go to get rid of his money?

9            MR. PAUL:  Objection.

10           THE COURT:  Sustained.  I want you to lay a foundation

11  for that conversation.

12  Q.  Officer Gembecki, earlier did you testify about the

13  conversation you had with the defendant in the lobby of the

14  building?

15  A.  Yes.

16  Q.  And did you testify that the defendant said that he wanted

17  to get rid of his money?

18  A.  That's correct.

19  Q.  Did the defendant ask where -- or where, if anywhere, did

20  the defendant ask to go in the building?

21  A.  He asked to go into an apartment.

22           MR. PAUL:  I'm sorry?

23           THE WITNESS:  Asked to go into an apartment.

24           THE COURT:  In the building?

25           THE WITNESS:  Correct.

1    Q.  Did you go to an apartment in the building?

2    A.  We did not.

3    Q.  Why didn't you?

4    A.  It was a lot of money.  And it was going to stay in our

5    custody until he either got a DAT or vouchered.

6            MS. CASTELLANO:  Your Honor, no further questions.

7            THE COURT:  All right.  When you say "it was a lot of

8    money," do you remember approximately how much it was?

9            THE WITNESS:  I don't remember exactly.  It's on the

10   voucher.

11   CROSS EXAMINATION

12   BY MR. PAUL:

13   Q.  Officer, you said that on the day of August 4, 2014, you

14   arrived on Decatur Avenue at approximately 5:45 p.m., right?

15   A.  That's correct.

16   Q.  And you said yourself -- you and your other officer set

17   yourself up on a rooftop of a building on that block?

18   A.  That's correct.

19   Q.  And you said the building was on the corner of Decatur and

20   193rd?

21   A.  That's correct.

22   Q.  And you said that the building that you ultimately went

23   inside of with Mr. McDow was 2563 Decatur Avenue, right?

24   A.  I believe that was the address.

25   Q.  And, in fact, when you arrested him and charged him, you

1    indicated that this all took place in front of 2563 Decatur

2    Avenue, is that right?

3    A.   I was not observing where they were.

4    Q.   No.  But when you arrested him, it was in front of -- you

5    went into a building, correct?

6    A.   Correct.

7    Q.   That was 2563 Decatur?

8    A.   I believe so.  Not positive.

9    Q.   And when you ultimately arrested him, and Mr. McDow and you

10   went to the DA's office in New York County, you made out a

11   criminal complaint; is that right?

12   A.   I did not do that.

13   Q.   Who did that; your brother, Officer Kinane?

14   A.   Correct.

15           THE COURT:  Did you go to New York County?

16           THE WITNESS:  I did not go down, no.

17   Q.   It was Bronx County that was arrested, right?

18   A.   That's correct.

19   Q.   When you were on the rooftop, you said your role was pretty

20   much to protect your brother officer from anybody else coming

21   up to the rooftop at that time when he was observing whatever

22   he was observing; is that right?

23   A.   That's correct.

24   Q.   Were you yourself observing what was taking place on the

25   street?

G4EEMCDH                    Gembecki - cross

1    A.  I was not.

2    Q.  So your focus was not on the street at all, is that right?

3    A.  That's correct.

4    Q.  Now, let me show you --

5              MR. PAUL:  Your Honor, I don't know how you want me to

6    mark these.  It's a photograph.  Can I mark it as Defendant's A

7    for purposes of evidence?

8              THE COURT:  That's fine.

9              MR. PAUL:  May I approach, Judge?

10             THE COURT:  You may.

11   BY MR. PAUL:

12   Q.  I'm going to show you a photograph marked for

13   identification for the purposes of this hearing and ask you if

14   you recognize what's depicted in that photograph.

15   A.  That's Decatur Avenue between East Fordham Road and East

16   193rd Street.

17   Q.  Would it be fair to say this is a fair and accurate

18   representation of looking down at Decatur east toward East

19   193rd Street?

20   A.  That would be correct.

21   Q.  In the middle of -- looks like in the middle of the street?

22             THE COURT:  It's a view north?

23             THE WITNESS:  Yes.

24             MR. PAUL:  Thank you, your Honor.

25             I move to introduce it.

1          THE COURT:  Any objection?

2          MS. CASTELLANO:  No, your Honor.

3          THE COURT:  Defense Exhibit A is received.

4          (Defendant's Exhibit A received in evidence)

5    BY MR. PAUL:

6    Q.  Can you show, if at all possible from this picture -- is

7    the building that you were on top of with your brother officer

8    depicted in this photograph?

9    A.  Yeah.  It was this building right here.

10         MS. CASTELLANO:  Your Honor, may I?

11         THE COURT:  Why don't you come up.

12   Q.  And then if you could describe that in some way so we have

13   a record of the building you're pointing out.

14   A.  It looks like it's this corner building, with the green --

15   looks like a green above the building.

16   Q.  Do you remember these green things on top of that building?

17   A.  No, I don't.

18   Q.  Okay.  What's depicted in this photo is a stop sign, is it

19   not?

20   A.  That's correct.

21   Q.  Would that be East 193rd Street that intersects Decatur?

22   A.  Yes.

23   Q.  So the building you were in was approximately two buildings

24   off the block of East 193rd Street, is that right?

25         THE COURT:  On the east side of the street.

1   A.   It was on the southeast side.

2   Q.   Okay.  But it is this building?

3   A.   So it would be maybe this building there.

4   Q.   So you think it may not -- now your testimony is you think

5   it was closer to the corner?

6   A.   Well, this picture is hard to tell if that building is past

7   the stop sign or before it.  But it looks like it's going to be

8   this building.

9           MR. PAUL:  Okay.

10          THE COURT:  Can we describe that building in some

11  fashion, or is that impossible?

12  A.   It's going to be the building just south of -- looks like

13  whatever these green points are on top of that building.

14  Q.   So you're depicting this building?

15  A.   Correct.

16  Q.   And it's a building that looks like it's on 193rd Street

17  just past the stop sign, right?

18  A.   No, before the stop sign.

19  Q.   You think this is on Decatur corner?

20  A.   Yes.  It's going to be on -- this building is on the

21  southeast corner of East 193rd Street.

22  Q.   Do you want to look carefully?

23  A.   It's a hard picture to tell.

24  Q.   But nevertheless, it's that building.  That's approximately

25  five floors, right?

1    A.  I can't testify that's definitely the building, but it was

2    on the southeast corner of East 193rd Street and Decatur

3    Avenue.

4          THE COURT:  Why don't you put an X right above that,

5    the building that you think it is.

6    A.  This is the stop sign here.  So that building actually was

7    on the north side.  So it looks like it may be here.

8    Q.  So you're depicting now a different building that's closer

9    to the Burlington department store?

10   A.  Yes.

11   Q.  And this building is five stories high, is that right?

12   A.  That's what it looks like, yes.

13   Q.  And now you say it's not the first building but the second

14   one that you put an X on?

15   A.  Yes.  The picture is hard to tell.

16   Q.  Okay.  Thank you.

17          Now, while you were on the rooftop and Officer Kinane

18   is observing, you told us that he was telling you or describing

19   to you what he was observing, is that right?

20   A.  That's correct.

21   Q.  And he gave you a description, I believe, of an individual

22   that he seemed to have focused on who he described as how?

23   A.  I believe it was a male black, white, long-sleeve T-shirt,

24   heavyset.

25   Q.  Any other details that you recall?

1   A.  Heavyset.

2   Q.  Heavyset, long white T-shirt and male black?

3   A.  Correct.

4   Q.  Did you write this description down anywhere?

5   A.  I did not.

6   Q.  Now, you testified that after you were up on that

7   rooftop -- for approximately 30 minutes, I think you said,

8   somewhere around there?

9   A.  Ballpark 30, 40 minutes.

10   Q.  You're both in uniform?

11   A.  Correct.

12   Q.  You parked your patrol car where?

13   A.  On the street.  I don't recall exactly where.

14   Q.  On Decatur Avenue?

15   A.  I don't know.

16   Q.  You don't recall?

17   A.  I don't recall.

18   Q.  You were the driver, right?

19   A.  That's correct.

20   Q.  So you drove to this location, and you were also the driver

21   when you went to 2563 Decatur?

22   A.  That's correct.

23   Q.  Now, you said you've made a number of arrests on that

24   block, right?

25   A.  I didn't say that.

1    Q.  Have you made a number of arrests on that street?

2    A.  I have not.

3    Q.  Have you ever made an arrest on that street?

4    A.  I don't believe so, no.

5    Q.  So this was the first time and only time that you ever

6    observed Decatur Avenue in the course of your being a police

7    officer?

8    A.  No.  I entered radio runs.  I answered noise complaints.  I

9    conducted verticals.

10   Q.  In what buildings?

11   A.  The buildings on Decatur Avenue between East Fordham Road

12   and East 193rd Street.

13   Q.  You have been at Decatur Avenue conducting verticals?

14   A.  Yes.

15   Q.  So you've been in buildings on that block?

16   A.  That's correct.

17   Q.  And you've gone inside of those buildings, looking and

18   observing for paraphernalia, if nothing else, right?

19   A.  That's correct.

20   Q.  So then it's fair to say that you are familiar with that

21   block?

22   A.  I'm familiar, yes.

23   Q.  Are you familiar with 2563 Decatur Avenue?

24   A.  I can't testify if I went into that building before, but

25   I've been in the buildings on that block.

1   Q.  I'm going to show you a couple of photographs which I have

2   marked as Defendant's Exhibit B and C for purposes of

3   identification.

4            MR. PAUL:  Excuse me, Judge, forgive me.

5   Q.  Officer, you see this photograph?

6   A.  I do.

7            THE COURT:  This is Defense Exhibit B?

8            MR. PAUL:  Yes.

9   Q.  Is that a fair and accurate representation of standing on

10  the sidewalk and facing 2563 Decatur Avenue?

11  A.  It is.

12           MR. PAUL:  Your Honor, I move to introduce this

13  photograph.

14           THE COURT:  Any objection?

15           MS. CASTELLANO:  No, your Honor.

16           THE COURT:  Defense Exhibit B is received.

17           (Defendant's Exhibit B received in evidence)

18  BY MR. PAUL:

19  Q.  Now I'm going to show you another photograph marked as

20  Defendant's Exhibit C.  Is that a fair and accurate

21  representation of 2559 and 2563 Decatur Avenue?

22  A.  It is.

23  Q.  Is it your testimony, Officer, that the building you

24  entered -- is it still your testimony that you entered 2563

25  Decatur Avenue?

G4EEMCDH                    Gembecki - cross

1   A.  I said I believe so, but looking at the video, it looked

2   like it was 2559.

3   Q.  And, in fact, all your paperwork when Mr. McDow was

4   arrested indicated 2563 is the building or in front of the

5   building where he was arrested; is that right?

6   A.  I didn't complete any paperwork for him.

7   Q.  You completed no paperwork?

8   A.  Correct.

9           THE COURT:  Are you offering Exhibit C?

10          MR. PAUL:  I'm sorry.  Yes, Judge, please.

11          THE COURT:  Any objection?

12          MS. CASTELLANO:  No, your Honor.

13          THE COURT:  Defense Exhibit C is received.

14          (Defendant's Exhibit C received in evidence)

15  BY MR. PAUL:

16  Q.  Now, Officer, let me just show you -- you made out a memo

17  book, did you not?

18  A.  Correct.

19  Q.  Let me show you what's been previously marked as 3501-01.

20  I'll do it on the screen.  It's easier.

21          This is the front of your memo book, am I right?

22  A.  Yes.

23  Q.  It says, date open, August 3, 2014; date close, March 7,

24  2015.  Right?

25  A.  That's correct.

1    Q.   This is the next page of your memo book.  Right?

2    A.   That's correct.

3    Q.   And at the bottom of that is an entry of August 4, 2014.

4    It's a Monday.  Assigned 52nd.  Right?

5    A.   That's correct.

6    Q.   And then the next page of your memo book indicates where

7    highlighted 1840, or 6:40, in the late afternoon --

8              MS. CASTELLANO:  Objection, your Honor.

9              THE COURT:  Grounds?

10             MS. CASTELLANO:  No foundation.  It's not in evidence.

11             MR. PAUL:  Okay.  I'll introduce it.

12   Q.   Is this your memo entry, your memo book that I've just

13   shown you, taken or handed over to the government that includes

14   your assignment on August 4, 2014?

15   A.   It is.

16             MR. PAUL:  Your Honor, I introduce it.

17             MS. CASTELLANO:  Objection, your Honor.

18             THE COURT:  Grounds?

19             MS. CASTELLANO:  Hearsay.

20             THE COURT:  Well, actually, the rules of evidence

21   don't apply here.  But what's --

22             MR. PAUL:  I'll ask if it refreshes his recollection

23   instead, Judge.

24             THE COURT:  Well, he hasn't had a failure of

25   recollection yet.

BY MR. PAUL:

Q.  Do you remember making an entry in your memo book on

August 4th of the arrest of McDow, indicated that one under

criminal possession of a controlled substance, front of 2563

Decatur, James McDow?

A.  I don't remember making the entry, but that's my

handwriting.

Q.  You don't remember it but it is your handwriting?

A.  Correct.

Q.  So it doesn't refresh your recollection that you wrote down

2563; is that your testimony?

A.  That's correct.

Q.  By the way, when Officer Kinane was describing what he was

observing, did he tell you that this individual that he

described to you, this heavy male black, was being approached

by individuals?  Is that your testimony?

A.  Yes.

Q.  And did he tell you where this was taking place?

A.  No.

Q.  Sorry?

A.  I didn't hear him say where.

Q.  Now, when you now leave the rooftop and go to wherever your

car was parked, because you don't recall where that was, you

then drove to the block that you described of Decatur Avenue

between East Fordham and 193rd, right?

1    A.  That's correct.

2    Q.  And you were driving, right?

3    A.  I was.

4    Q.  And you pulled up to what turns out to be 2559 Decatur and

5    parked your car, right?

6    A.  That's correct.

7    Q.  And you get out of the vehicle and approached Mr. McDow,

8    and there was several other individuals congregated in that

9    location, right?

10   A.  That's correct.

11   Q.  What were the first words you said, if anything, as you

12   approached that group of individuals?

13   A.  I don't recall my exact conversation.

14   Q.  Well, did you tell them to get away from this location,

15   you're loitering, or you just can't hang out here, any words to

16   that effect?

17   A.  No.

18          MR. PAUL:  Your Honor, with the Court's permission,

19   I'm going to play from my phone what has already been

20   introduced.  And it's a little easier for me.  And since I

21   couldn't use my computer, we've tested it with my phone.  So

22   I'm going to show the same video that was shown.

23          THE COURT:  The first video?

24          MR. PAUL:  Yes.

25          THE COURT:  So this is Government Exhibit 2?

1             MR. PAUL:  Correct.

2    BY MR. PAUL:

3    Q.  I'm going to show you the same video that you saw before

4    that's introduced into evidence.  (Video played)

5             MR. PAUL:  There's an audio on mine.  There shouldn't

6    be.

7    Q.  Now, this is you pulling up, is that right?

8    A.  That's correct.

9    Q.  And you're getting now -- you're going to get out on the

10   driver's side of the vehicle, correct?

11   A.  That's correct.

12   Q.  And Mr. McDow is the individual who's standing with sort of

13   his back or his side to the street as you approach around the

14   garbage bags, correct?

15   A.  Yes.

16   Q.  Now, you now are talking in the general direction and

17   waving your hand, not just to McDow but to everyone in that

18   group.  Does that refresh your recollection as you look at

19   that?

20   A.  No.

21   Q.  That doesn't?

22   A.  No.

23   Q.  Okay.  And you see now McDow leave and this individual with

24   the red shirt is walking away.  And as they're walking away,

25   Officer, I couldn't help but notice you reached with your right

1    hand into your shirt pocket.

2            Do you see that?

3    A.  No.

4    Q.  We'll play it again.

5            (Video played)

6            Right there.  You look down at your hand, and then you

7    look in the direction of where McDow is walking off to.  Do you

8    see that?

9    A.  Yes.

10   Q.  Do you recall what you took out of your front shirt pocket

11   at that time, looked at, put it back and then called or

12   certainly faced McDow?

13   A.  I don't know, but I keep my cell phone in that pocket when

14   I wear the shirt.

15   Q.  You keep what?

16   A.  My cell phone in my front pocket.

17   Q.  You believe that was a cell phone in your shirt pocket that

18   you pulled out, looked at and put back?

19   A.  That's where I keep my cell phone when I'm on duty, in

20   uniform.

21   Q.  I see.  And do you recall what it is, if anything, you said

22   that caused Mr. McDow, who had walked away from you, along with

23   several others, to return to where you were standing?

24   A.  Something along the lines of, sir, we need to talk to you.

25   Q.  Sir, we need to talk to you?

A.  Something along of lines of that.

Q.  All right.  Now we'll continue.

        (Video played)

        And now McDow comes into the picture momentarily.  And
you usher him over to right in front of that building,
alongside the garbage bags.  Is that right?

A.  That's correct.

Q.  And at the bottom of that screen is your brother Officer
Kinane, is that right?

A.  That's correct.

Q.  And he takes a position right behind Mr. McDow as you are
now talking to Mr. McDow, correct?

A.  He's behind him.  That's correct.

Q.  And at this point do you recall what you're discussing with
Mr. McDow?

A.  Something along the lines of asking him if he had anything
on him that he shouldn't have.

Q.  And you now recall that was something you asked him on the
street?

A.  It was something along the lines of that, yes.

Q.  Not inside the building?

A.  We asked him that multiple times.

Q.  I see.  So you asked him at this point, as you're facing
him on the street and Officer Kinane is approaching his rear,
whether there's anything he has on him that he -- what was the

1   exact words, if you can recall?

2   A.  I can't recall exact words.  It was along the lines of if

3   he had anything on him he shouldn't have.

4   Q.  Meaning, is there anything illegal on your possession;

5   right?

6   A.  Correct.

7   Q.  Now, let me continue with this.  And are you now looking in

8   his right front pocket?

9   A.  Looks like I'm touching his pocket.

10  Q.  Touching it?

11  A.  That's what it looks like.

12  Q.  How about reaching in and having him reach in as well?

13  A.  Doesn't look like my whole hand is in his pocket.

14  Q.  I'm sorry.  You have to slow down.

15  A.  Doesn't look like my hand is in his pocket.

16  Q.  And continuing.  You're not looking in his pocket there?

17  That's your testimony?

18  A.  I don't know if I am.

19  Q.  Okay.  And this is now continuing.  And now you go to his

20  left side, correct?

21  A.  That's correct.

22  Q.  And Officer Kinane remains behind him, right?

23  A.  That's correct.

24  Q.  Let me ask you something, Officer:  At this point could

25  McDow have simply walked away from you guys, you and your

G4EEMCDH                    Gembecki - cross

1   brother officer?

2   A.  No.

3   Q.  Right.  Let's continue.

4          Did you see McDow put his hands up, somewhat put his

5   hands back down, and now you seem to be looking in his back

6   pocket?  Am I correct about that?

7   A.  I don't see myself looking in his pocket.

8   Q.  Reaching into his back pocket?

9   A.  I don't see my hand going in his pocket.

10  Q.  Your right hand is not on his bottom pants?

11  A.  On his pocket.  I don't know if it's in his pocket.

12  Q.  And you're having a conversation with him obviously for

13  several minutes at this point, or a couple of minutes.  And

14  it's your testimony -- correct me if I'm wrong, Officer -- that

15  during this conversation, he was the one telling you and your

16  brother officer he wanted to go inside the building?

17  A.  That's correct.

18  Q.  You did not suggest that to him?

19  A.  He was very adamant about going inside the building.

20  Q.  I see.  And when you are arresting somebody who's adamant

21  about something, is it your general --

22          THE COURT:  Sustained.

23          MR. PAUL:  I'll withdraw.

24          THE COURT:  Sustained.

25          MR. PAUL:  Let's continue.

1          (Video playing)

2          I'm sorry, Judge, but because this was copied on to my

3   phone, I think there may be an overlap of a minute or so.  But

4   then it continues.

5   BY MR. PAUL:

6   Q.  Now, at this point McDow is reaching into his pocket.  And

7   it looks like he is using a key to gain entry into the

8   building, right?

9   A.  Yes.

10  Q.  Did you ask him any questions with regard to his

11  connection, if any, to that building?

12  A.  I don't recall.

13  Q.  Now, you all go inside, the three of you.  And you're

14  inside the building now for, as we said, approximately five

15  minutes.  I'm not going to waste the Court's time showing

16  nothing happening on the street.

17          But your testimony is now that you believe it was

18  approximately five minutes; is that right?

19  A.  Yes.

20  Q.  I don't think we want to see my personal pictures.

21          And this continues again.  Time is running down.  And

22  we can zero in, if you need to, at the clock on the bottom

23  showing how much time exactly transpired.  Now we get to the

24  video where we move this forward to -- we're still in the

25  building.

1              Now, inside the building during this five or six

2     minutes or so, what is exactly occurring?

3     A.   We're having a conversation with Mr. McDow asking him if he

4     had anything on him.

5     Q.   For the second time at least, right?

6     A.   Correct.

7     Q.   Go ahead.

8     A.   And at that point approximately a bundle of heroin was

9     recovered.  He also asked us to go to an apartment to get rid

10    of his money.

11    Q.   Did he tell you where that apartment was?

12    A.   No.

13    Q.   Did you inquire as to where it was?

14    A.   No.

15    Q.   Did you ask him whether he had a key to the mailbox to

16    verify that he was at -- had access to that building legally?

17    A.   No.

18    Q.   We'll continue to show this.  I believe soon you will be

19    coming out of the building.

20              (Video playing)

21              Stop it for a second.  Do you recall the very first

22    time you were interviewed by the government with regard to the

23    events of August 4, 2014?

24              THE COURT:  You mean the US Attorney's Office?

25              MR. PAUL:  What did I say?

1          THE COURT:  You said the government.

2          MR. PAUL:  I'm sorry.

3   BY MR. PAUL:

4   Q.  US Attorney's Office.

5   A.  Yes.

6   Q.  Do you remember what date was that?

7   A.  I don't recall.

8   Q.  Was it in December of 2015?

9   A.  I don't recall.

10  Q.  I'm going to show you what's been previously marked as

11  3501-2.  Do you recall attending a meeting with the US

12  attorney --

13          THE COURT:  You need to give an exhibit number.

14          MR. PAUL:  I'm sorry, 3501-02.  And it says

15  December 15, 2015.

16  A.  Yes, that's -- that's what it says on the top.

17  Q.  Does that refresh your recollection of having a meeting

18  with the government on that date?

19  A.  I don't recall if it were in person or telephone.

20  Q.  I'm sorry?

21  A.  I don't recall if it was in person or telephone.

22  Q.  I see.  At that meeting was there any discussion, as best

23  you can recall, as to what the defendant was alleging occurred

24  on August 4, 2014?

25  A.  Not that I recall.

1   Q.  Did anybody discuss with you perhaps motion papers and/or

2   affidavits that was submitted to the Court on December 7th of

3   2015?

4   A.  Not that I recall.

5   Q.  Let's just continue, then.  Okay.  Now, you believe --

6   you've seen the video, right?

7   A.  Yes.

8   Q.  Do you recall that while watching the video, you and your

9   brother officer come out with Mr. McDow, and you go to the car,

10  and then the video reverses and goes back to it again?  Do you

11  remember seeing that?

12  A.  Yes.

13  Q.  This is you exiting.

14          Now, who was the individual, you or Officer Kinane,

15  who recovered the 10 bundles?

16  A.  The ten bundles?

17  Q.  Yes.

18  A.  Officer Kinane.

19  Q.  And he was the one who vouchered them as well?

20  A.  That's correct.

21  Q.  Did you see them at any time?

22  A.  I did.

23  Q.  And can you describe, as best you can, the size together of

24  these ten bundles?

25  A.  It was a couple inches long, couple inches wide, wrapped in

1    cellophane with crack cocaine inside.

2            THE COURT:  He was asking you about ten bundles.  I

3    assume that was ten bundles of heroin?

4            THE WITNESS:  That's correct.

5            THE COURT:  You just said crack.

6            THE WITNESS:  That was wrapped in the cellophane.

7            THE COURT:  Okay.  So the heroin was in glassines.

8    The crack was in cellophane?

9            THE WITNESS:  There was one wrapped together in

10   cellophane.

11           THE COURT:  Oh.  It was all wrapped together.  Okay.

12           MR. PAUL:  Judge, while I have this officer on the

13   stand, I'd like him to look at this, even though it's not in

14   evidence, rather than have to call him back.

15           THE COURT:  Sure.

16           MR. PAUL:  Thank you.

17   BY MR. PAUL:

18   Q.  Looking at this Government Exhibit 3, is there any way to

19   tell from the items contained in this what we're talking about

20   in terms of the ten bundles of heroin?

21   A.  Well, it looks like these are all opened already.  And

22   these were all, you know, in a stack.  They were stacked up

23   like this in rubber bands.

24   Q.  I see.  So you can't tell -- in other words, these are the

25   items we're talking about that consist of ten of these; or

1    we're talking about more than ten of these?

2    A.   Well, a bundle is ten glassine envelopes.  So it would be

3    ten of these, and he had multiple bundles.

4    Q.   Okay.  But initially you took ten bundles from him, right?

5    A.   No, I didn't say that.

6    Q.   Okay.  Initially how much drugs did you take from him

7    before he went to the patrol car with you?

8    A.   Other drugs were recovered.  I didn't count each glassine,

9    but it was approximately a bundle.

10   Q.   Okay.  So a bundle?

11   A.   One bundle.

12   Q.   Is ten?

13   A.   Would be ten.

14   Q.   That's what I asked.  So the ten bundles --

15            THE COURT:  No.  You're confusing bundles --

16   Q.   Sorry.  The one bundle, meaning the ten glassine envelopes,

17   were these the items that you recovered or Officer Kinane

18   recovered, or you don't recall?

19   A.   I believe that I recovered it.

20   Q.   And you recovered that inside the lobby or out on the

21   street?

22   A.   It was the lobby.

23   Q.   And that was located where?

24   A.   Inside the lobby on the --

25   Q.   No, on him.

1    A.   Waistband.

2    Q.   Which side?

3    A.   I don't recall.

4    Q.   When you say "waistband," you mean tucked into behind his

5    belt, underneath his pants?

6    A.   It was behind his belt.

7    Q.   Behind his belt.  And you don't recall left or right?

8    A.   I don't.  I believe the left, but I'm not positive.

9    Q.   But you then took those items, and what did you do with

10   them when you took them from the defendant?

11   A.   I took them into my custody.  I believe I put them in my

12   pocket.

13           THE COURT:  Could you tell me again how it was that

14   you got those ten glassines.

15           THE WITNESS:  Mr. McDow admitted he had a couple of

16   Bs, couple of crills on him.

17           THE COURT:  And then after he -- and this was in

18   response to your question, do you have anything on you you

19   shouldn't have?

20           THE WITNESS:  That's correct.

21           THE COURT:  And he said how many Bs?

22           THE WITNESS:  He didn't specify.

23           THE COURT:  He said Bs and crills?

24           THE WITNESS:  And crills.

25           THE COURT:  Okay.  And after he said that, what was

1   the next thing that happened?

2           THE WITNESS:  I don't recall if I asked him to recover

3   it and give it to me or if I recovered it or if I asked him

4   where it was and recovered it.

5           THE COURT:  So either you asked him to turn it over

6   or --

7           THE WITNESS:  Or I recovered it.

8           THE COURT:  Or you took it?

9           THE WITNESS:  Yeah.

10          THE COURT:  Do you remember seeing it?

11          THE WITNESS:  Yes.

12          THE COURT:  You saw it in his waistband?

13          THE WITNESS:  No.  I did not see his waistband.  I saw

14  it once it was taken out.

15          THE COURT:  Right.  Okay.

16  BY MR. PAUL:

17  Q.  Now, he's being ushered out from the building, handcuffed

18  behind him, is that right?

19  A.  That's correct.

20  Q.  And you get in the front, I assume, as the driver, and

21  Officer Kinane and he get in the back; is that right?

22  A.  That's correct.

23  Q.  Now, you testified that it was inside the car that there

24  was further discussions about a DAT, is that right?

25  A.  That's correct.

1  Q.  And that was a discussion that you overheard between

2  Mr. McDow and Officer Kinane?

3  A.  That's correct.

4  Q.  And your recollection is that Officer Kinane mentioned

5  something to the defendant about him getting a DAT for the

6  drugs, right?

7  A.  That we were looking to get him a DAT, correct.

8  Q.  That what?

9  A.  That we were looking to get him the DAT, correct.

10  Q.  And he responded by saying words to the effect, no, because

11  I have more drugs on me, or something like that; I have

12  additional drugs on me, drugs on me?

13  A.  Something along those lines, yes.

14  Q.  And were those drugs recovered in the police car?

15  A.  Yes.

16  Q.  And who recovered those drugs?

17  A.  Officer Kinane.

18  Q.  And do you recall how that occurred?

19  A.  I don't recall if he pulled it out or if Officer Kinane

20  did.  I don't recall.

21  Q.  And do you recall if -- by the way, you've discussed this

22  matter with Officer Kinane before testifying, right?

23  A.  No.

24  Q.  Not at all?

25  A.  When we drew up the case, briefly.  Nothing -- no

G4EEMCDH                    Gembecki - cross

1    specifics.

2    Q.  No discussions of your conversations with the government --

3    with the prosecutor's office; nothing with regard to Officer

4    Kinane's arrest, testimony in the grand jury; nothing about

5    that was discussed between the two of you?

6    A.  I did not discuss that with Sean.

7    Q.  Okay.  Was Mr. McDow handcuffed behind his back the entire

8    ride to the precinct?

9    A.  He was.

10   Q.  So the way you saw him exiting the building is exactly how

11   he remained until you got him to the precinct, is that right?

12   A.  Yes.

13          MR. PAUL:  I believe that's it, your Honor.  Just give

14   me one second, please.

15   Q.  Now, do you recall on the December 15, 2015, meeting you

16   had with the US attorney or discussion you had with her over

17   the phone, telling her that written or verbal statement at

18   precinct?

19   A.  Do I recall?  I'm sorry.  Can you repeat that?

20   Q.  Do you recall telling the prosecutor, Ms. Castellano, on

21   December 15, 2015, whether in person or on phone, because you

22   don't recall, that it was -- specifically, written or verbal

23   statement at precinct?

24   A.  I do recall saying that Mr. McDow spoke to detective squad.

25   Q.  Mr. McDow spoke to?

1   A.  Detective squad.

2   Q.  So this is a statement that you believe he made to the

3   detective squad, not you?

4   A.  I was not present for that.

5   Q.  So all the statements that you recall him having made on

6   August 4, 2014, from the time you approached him on the street

7   to the time that you arrested him, took him in the car to the

8   precinct, you've already told us about; is that right?

9   A.  That's correct.

10  Q.  Officer, I know you testified that you don't recall

11  exactly, if at all, where you parked the car before you went up

12  to the rooftop.  Right?

13  A.  That's correct.

14  Q.  Do you recall at least the street, whether it was on

15  Decatur or East 193rd Street?

16  A.  I don't recall.

17  Q.  You don't remember that?

18  A.  I know it wasn't Decatur Avenue.

19  Q.  Well, you got into the car.  Do you recall whether you

20  had -- you know it was not on Decatur Avenue?

21  A.  I don't believe it was on Decatur, no.

22  Q.  When you got into the car, do you recall approximately how

23  long it took for you to arrive at what turns out to be 2559

24  Decatur Avenue?

25  A.  I would say approximately five minutes, maybe a little

1    less.

2    Q.  Did you see anything else, other than what you've told us,

3    as your car approached 2559 going down Decatur Avenue?

4    A.  No.

5           MR. PAUL:  Thank you, Judge.  I have nothing further

6    at this time.

7           THE COURT:  All right.  Redirect?

8           MS. CASTELLANO:  Yes, your Honor.

9    REDIRECT EXAMINATION

10   BY MS. CASTELLANO:

11   Q.  Officer Gembecki, I'm showing you what was marked Defense

12   Exhibit A.  Did you put an X on top of the building that you

13   believed that you were on the roof of?

14   A.  Yes.

15   Q.  Were you able to tell for sure that that was the building,

16   the exact building that you were on the roof of on August 4,

17   2014?

18   A.  It's hard to tell from that picture.

19   Q.  And when you watched the video on Government Exhibit 2

20   earlier, do you know either way whether the clock on the bottom

21   of that video was accurate?

22   A.  I do not know.

23   Q.  Do you know whether that video on Government Exhibit 2 is a

24   surveillance video or someone using a recording device to

25   record a surveillance video?

1   A.  It appeared that somebody was recording, monitor of that

2   video.

3   Q.  You reviewed that video at the US Attorney's Office prior

4   to this hearing, right?

5   A.  That's correct.

6   Q.  And at one point on that video does it appear that this

7   surveillance video is being rewinded and then played again?

8   A.  It does.

9   Q.  And when you and Officer Kinane handcuffed the defendant on

10  August 4, 2014, did you use one set of handcuffs or two?

11  A.  We used two.

12  Q.  Why did you use two?

13  A.  He's a larger individual.  It was for comfort for him.

14              MS. CASTELLANO:  Your Honor, may I have a moment?

15              THE COURT:  Yes.

16              MS. CASTELLANO:  No further questions, your Honor.

17              THE COURT:  Anything else, Mr. Paul?

18              MR. PAUL:  No, your Honor.

19              THE COURT:  You may step down.

20              (Witness excused)

21              THE COURT:  Government, call its next witness.

22              MS. CASTELLANO:  Yes, your Honor.  Officer Sean

23  Kinane.

24                              - - - - -

25

1    SEAN KINANE,

2         called as a witness by the Government,

3         having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MS. CASTELLANO:

6    Q.  Good afternoon.

7              Officer Kinane, who do you work for?

8    A.  I work for the New York City Police Department.

9    Q.  What's your title?

10   A.  Police officer.

11   Q.  Where do you work?

12   A.  I work in the 52nd precinct in the Bronx.

13   Q.  How long have you been a police officer?

14   A.  It will be six years in July.

15   Q.  What's your assignment at the 52nd precinct?

16   A.  I currently do conditions.

17   Q.  What are conditions?

18   A.  Conditions are things that need to be addressed in the

19   precinct; could be narcotics, prostitution, quality of life,

20   disorderly groups.

21   Q.  And were you working in conditions in the summer of 2014?

22   A.  Yes.

23   Q.  By August 2014 approximately how many arrests had you been

24   involved in?

25   A.  Approximately at least over 100 arrests.

1   Q.  And of those, how many were narcotics arrests?

2   A.  I'd say probably 60, 70.

3   Q.  Since August of 2014, approximately how many arrests have

4   you been involved in?

5   A.  I've been involved in over 300 -- well, involved in

6   probably over thousands.  But my own, about 300 arrests.

7   Q.  Is that since August of 2014 or the whole time you've been

8   a police officer?

9   A.  Since, I think 200.

10  Q.  And of those, how many have been narcotics arrests?

11  A.  I'd say 175.

12  Q.  Officer Kinane, are you familiar with Decatur Avenue

13  between 193rd Street and Fordham Road?

14  A.  Yes.

15  Q.  How are you familiar with that block?

16  A.  I'm familiar with the block because it's a known narcotics

17  location, East Fordham to East 193rd Street, Decatur Avenue.

18  I've made arrests in that area prior to this date.  I've also

19  done car stops coming out of that area, where I had recovered

20  narcotics.  Those buildings I've patrolled before, and I got to

21  know them pretty well in my time.

22  Q.  What, if anything, did you observe while you were

23  patrolling those buildings on Decatur Avenue?

24  A.  In that area, in those buildings on Decatur, there was a

25  lot of drug paraphernalia; crack pipes, heroin, empty glassines

1    of heroin, empty needles, things like that.  And throughout the

2    buildings and the lobbies and the stairways.

3    Q.  Directing your attention to August 4, 2014.  Did you work

4    that day?

5    A.  I did.

6    Q.  What hours did you work that day?

7    A.  I worked 3:00 p.m. until 11:35 at night.

8    Q.  Did you work with a partner?

9    A.  Yes.

10   Q.  Who was that?

11   A.  Officer Gembecki.

12   Q.  Had you worked with Officer Gembecki in the past?

13   A.  I have.

14   Q.  Were you and Officer Gembecki working in a vehicle that

15   night?

16   A.  We were.

17   Q.  What type?

18   A.  Unmarked police car.

19   Q.  What were you wearing that night?

20   A.  My New York City police uniform.

21   Q.  And did there come a time on that day, August 4, 2014, when

22   you decided to address conditions on Decatur Avenue between

23   193rd and Fordham Road?

24   A.  Yes.

25   Q.  What did you decide to focus on?

1   A.   Again, it's a known narcotics-prone location.

2   Q.   Approximately what time did you arrive on the block that

3   day?

4   A.   Approximately 5:30, 545.

5   Q.   And where, if anywhere, did you set up on that block?

6   A.   Rooftop.

7   Q.   Why did you choose a rooftop?

8   A.   Because it's a place where you could observe the entire --

9   the entire block from Fordham to 193rd Street.

10  Q.   Officer Kinane, I want to direct your attention to

11  Government Exhibit 1, which was previously admitted into

12  evidence to your left.  Do you recognize that?

13  A.   Yes.

14  Q.   What is it?

15  A.   Map of Decatur, East Fordham Road and 193rd Street.

16         MS. CASTELLANO:  Your Honor, may I approach.

17         THE COURT:  Yes.

18  Q.   Officer Kinane, I've just handed you a laser pointer.

19  Using that and Government Exhibit 1, can you show the Court

20  where you and your partner set up that day.

21  A.   We were set up here, on the -- the southeast corner.

22  Q.   Corner of what?

23  A.   East 193rd Street and Decatur.

24  Q.   Thank you.

25         And generally what area were you able to see from the

1  roof on that corner?

2  A.  You could see the whole block.  You could see Decatur all

3  the way from Fordham to 193rd, East 193rd.

4  Q.  And did you use anything to assist you in patrolling from

5  the roof that day?

6  A.  I did.  I had a pair of binoculars.

7  Q.  And where was Officer Gembecki?

8  A.  He was on the roof.

9  Q.  What was he doing?

10  A.  He was with me up there, just securing the roof, making

11  sure nobody came through the door up there.

12  Q.  And what time of day was it?

13  A.  Daylight, light out.  Daytime.

14  Q.  And who, if anyone, did you observe from the roof on

15  Decatur Avenue?

16  A.  I observed the defendant.

17  Q.  And do you see the person you described as the defendant

18  here in the courtroom here today?

19  A.  Yes.

20  Q.  Can you describe where he's seated and what he's bearing.

21  A.  He's seated right there.  He's wearing gray or black.

22          MS. CASTELLANO:  Your Honor, may the record reflect

23  that Officer Kinane has identified the defendant, James McDow.

24          THE COURT:  Yes.

25  Q.  Officer Kinane, while you were on the roof, what, if

1   anything, did you observe the defendant do?

2   A.  I observed the defendant standing between East Fordham and

3   Decatur, or East Fordham and 193 on Decatur standing on the

4   street.  I observed what I believed to have been a buyer,

5   somebody coming to purchase narcotics, walk down the street and

6   approach a possible lookout or a -- what is a steer; somebody

7   who would say, this is where you would go to purchase

8   narcotics.

9          As I'm observing this, this individual then came --

10  approached Mr. McDow.  And I observed a quick exchange or a

11  quick meeting.  And then individuals would leave the location

12  shortly after.

13  Q.  And when you say lookout or steerer, what significance does

14  that have, based on your training and experience?

15  A.  Based on what I'm looking at a -- it's a narcotics set, you

16  would say.  It's a -- you know, you're set up to deal drugs.

17  You have one person saying, you know, this is where you can go

18  get what you need.

19  Q.  And when you say "exchange," when you testified to an

20  exchange, what do you mean?

21  A.  I meant as two people meeting, two people meeting each

22  other, and then one of them leaving the location, the other one

23  staying; which is to me, my experience, what I've seen

24  throughout my arrests is -- would be considered a narcotics

25  transaction, or what I believed to be.

1   Q.  And you saw the defendant had this exchange with another

2   individual?

3   A.  Yes.

4   Q.  Did you see the defendant have this exchange with more than

5   one individual?

6   A.  I don't remember exactly how many.  I believe it was more

7   than one, but as -- today, to my recollection, I can't -- I

8   can't say exactly how many people I watched all day going

9   through, back and forth.

10  Q.  Did you observe the defendant do anything else?

11  A.  From what I remember, he was on that block for a good

12  period of time, standing out there, as I watched.

13          THE COURT:  How long did you watch?

14          THE WITNESS:  Forty-five minutes, an hour maybe.

15  Approximate times.

16  Q.  And do you recall what, if anything, you said to Officer

17  Gembecki while you were on the roof?

18  A.  I just said, I think this is going to be a deal right here,

19  or somebody is going -- someone's going with him, you know,

20  this person looks like they're going to come by, just -- in sum

21  and substance, that's what I was just telling him; you know,

22  this person looks like they're coming to buy drugs.

23  Q.  Did you see the defendant go into any location with any

24  other individual?

25  A.  I don't remember.  I believe somebody -- people did, but I

1  don't -- I don't recall like exact location or how many people.

2  Honestly, I can't -- I don't know.

3  Q.  Did you and Officer Gembecki leave the roof at some point?

4  A.  Yes.

5  Q.  Where did you go?

6  A.  To our police car.

7  Q.  Do you remember where your police car was parked?

8  A.  I believe I'd say 193 Street.

9  Q.  And after you got to your police car, where did you go?

10  A.  To -- we went to Decatur.

11  Q.  Did you and Officer Gembecki speak to the defendant on

12  Decatur Avenue?

13  A.  Yes.

14  Q.  And did you and Officer Gembecki also speak to the

15  defendant in the lobby of a building on Decatur Avenue?

16  A.  Yes, we did.

17  Q.  During your encounter with the defendant, do you recall if

18  the defendant made any statements?

19  A.  Exact statements, I -- he made a couple statements that I

20  remember somewhat.

21  Q.  What did he say?

22  A.  I remember he wanted to get rid of his cell phones and his

23  cash.  And at some point in our interaction he stated that, I

24  had a couple Bs and a couple crills.

25  Q.  And what, if anything, did you say in response to him

1  wanting to get rid of his cell phones?

2  A.  As far as the cell phones and the cash in the lobby, we --

3  we weren't going to let Mr. McDow go to an apartment at this

4  point.  Again, we weren't going to let him get rid of the

5  phones or the cash or -- we just were trying to get him to the

6  precinct.

7  Q.  And you also said that defendant said that he had a couple

8  of Bs and a couple of crills, is that right?

9  A.  Yes.

10 Q.  What did you understand Bs to refer to?

11 A.  Bs as bundles of heroin.  Crills at the time, I didn't -- I

12 assumed crack but I didn't know.  But that's what stuck out in

13 my mind.

14 Q.  And can you describe what a bundle of heroin consists of.

15 A.  A bundle of heroin would be ten glassines, glassine

16 envelopes of heroin, wrapped in a rubber band.

17 Q.  During your encounter with the defendant, do you recall

18 whether any narcotics were recovered from the defendant, either

19 on the street or in the lobby?

20 A.  Yes.

21 Q.  What was recovered?

22 A.  A bundle of heroin inside the lobby.

23 Q.  Did you go anywhere else in the building, other than the

24 lobby with the defendant?

25 A.  No.

1   Q.  Where, if anywhere, did you go after the lobby?

2   A.  After we handcuffed the defendant, we went to our police

3   car.

4   Q.  Did you handcuff the defendant before you left the lobby?

5   A.  I'm sorry.  What was that?

6   Q.  Did you handcuff the defendant before you left the lobby?

7   A.  Yes.  Yes, he was handcuffed before.

8   Q.  Did you use one or two sets of handcuffs?

9   A.  Two sets.

10  Q.  Why?

11  A.  Because he's a large, large person, large individual.

12  Q.  And then you said you went to your police car, right?

13  A.  Yes.

14  Q.  And where was Officer Gembecki situated in the police car?

15  A.  Officer Gembecki was driving.  I was seated in the back

16  seat of the police car, with Mr. McDow.  Mr. McDow was behind

17  Officer Gembecki.

18  Q.  Did you have a conversation with the defendant in the car?

19  A.  Yes.

20  Q.  Do you recall what you said to the defendant?

21  A.  In the car we were just talking about possible desk

22  appearance ticket, which means he would have been released that

23  day for the amount, the one bundle that he had.  He --

24          THE COURT:  How did that conversation come about?

25          THE WITNESS:  I mean, generally, if I'm arresting

1    somebody, if it's not a felony or something serious, I -- I'll

2    say, you know, here's -- I'll give you a desk appearance

3    ticket, and you'll be released the same day.  As long as, you

4    know, we have a mutual respect, I'll give everybody that

5    benefit of the doubt at that point.  So generally on most of my

6    arrests, if they're not felonies or something, where somebody

7    has resisted me, I'll offer them a DAT.

8    Q.  What, if anything, did the defendant say in response to

9    that?

10   A.  He stated that he was on parole and that he wouldn't be

11   eligible for a DAT.

12   Q.  And what, if anything, happened next in the back seat of

13   the vehicle?

14   A.  The defendant started to lean forward and inch additional

15   narcotics out of his waistband.

16   Q.  You testified that the defendant was handcuffed at this

17   time, right?

18   A.  Yes.

19   Q.  How was he able to get the narcotics out of his waistband

20   if he was handcuffed?

21   A.  He was double handcuffed, which gives you a lot more -- a

22   lot more room to move around.  It was -- so it wasn't that

23   difficult for him to get into the -- into his pants, into the

24   back.

25   Q.  And did you recover that narcotics, those narcotics from

1    the defendant?

2    A.   Yes, I did.

3    Q.   Was that in the back seat of the vehicle?

4    A.   Yes, it was.

5    Q.   And did you observe the narcotics coming out of the

6    defendant's pants?

7    A.   I'm sorry?

8    Q.   Did you observe the narcotics coming out of the defendant's

9    pants?

10   A.   Yes.

11          THE COURT:  How did it come about that he provided

12   this additional heroin to you in the car?  What preceded that?

13   Did you say anything to him before he handed you -- or somehow

14   got the additional heroin out of his pants?

15          THE WITNESS:  As I said, your Honor, before that we

16   were just having a discussion.  You know, I said, listen, you

17   know, this is a bundle of heroin.  It's not the end of the

18   world.  I can -- I'll get you -- try to get you out on a DAT,

19   if it's possible.  We'll get it sorted out at the precinct.

20          I guess he realized that he was on parole and he's not

21   going to be eligible for that DAT.  And I think that was --

22   that was the extent of the conversation.

23          THE COURT:  So after you had that conversation with

24   him about DAT and he said, I'm on parole, he then provided this

25   additional heroin to you?

1          THE WITNESS:  Yes.

2          THE COURT:  And was he able to use his hands to

3     retrieve the heroin, or how exactly did he get it out?

4          THE WITNESS:  I mean, to describe -- he just kind of

5     was like this and reached down the back -- the side of his

6     pants inside and kind of inched it out.  And it just came -- it

7     was right into the back seat of the police car.

8     BY MS. CASTELLANO:

9     Q.  Did this additional narcotics also render him unable to get

10    a desk appearance ticket that day?

11    A.  Yes.  That's -- yes, it did.

12    Q.  Did the defendant say anything about that?

13    A.  Not that I remember.

14         MS. CASTELLANO:  Your Honor, may I approach?

15         THE COURT:  Yes.

16    Q.  Officer Kinane, I'm handing you what's been marked for

17    identification as Government Exhibit 3.  Do you recognize

18    Government Exhibit 3?

19    A.  Yes.

20    Q.  What is it?

21    A.  It's a voucher of the narcotics that I recovered.

22    Q.  Does it also include the narcotics you recovered?

23    A.  Yes.

24    Q.  How do you know that?

25    A.  I know that because this is my handwriting on the voucher.

 1    I also know that because I recognize the hardcore stamp on the

 2    heroin.

 3              MS. CASTELLANO:  Your Honor, the government offers

 4    Government Exhibit 3 into evidence.

 5              MR. PAUL:  No objection.

 6              THE COURT:  Government Exhibit 3 is received.

 7              (Government's Exhibit 3 received in evidence)

 8    BY MS. CASTELLANO:

 9    Q.  Officer Kinane, in addition to the narcotics, did you

10    recover anything else from the defendant following his arrest?

11    A.  Yes.

12    Q.  What was that?

13    A.  Cell phones.

14              MS. CASTELLANO:  Your Honor, may I approach.

15              THE COURT:  Yes.

16    Q.  Officer Kinane, I'm handing you what's been marked for

17    identification as Government Exhibit 4.  Do you recognize

18    Government Exhibit 4?

19    A.  Yes.

20    Q.  What is it?

21    A.  Two cell phones.

22    Q.  And do you know where those cell phones came from?

23    A.  The defendant.

24    Q.  How do you know that?

25    A.  Because we vouchered my -- this was my partner's

1    handwriting, the voucher.

2            MS. CASTELLANO:  The government offers Government

3    Exhibit 4 into evidence.

4            MR. PAUL:  No objection.

5            THE COURT:  Government Exhibit 4 is received.

6            (Government's Exhibit 4 received in evidence)

7    BY MS. CASTELLANO:

8    Q.  Officer Kinane, stepping back a moment to Government

9    Exhibit 3.  Did you recover anything else besides heroin from

10   the defendant?

11   A.  Yes.

12   Q.  What else did you recover?

13   A.  Crack cocaine.

14   Q.  And when did you recover the crack?

15   A.  The same time that I recovered the heroin inside the

16   vehicle.

17   Q.  And how was the heroin and crack packaged?

18   A.  The heroin was -- they were bundled up in groups of ten in

19   small rubber bands, all wrapped in glassine -- or cellophane or

20   plastic.

21   Q.  And the crack?

22   A.  Crack was in small, clear ziploc bags.

23   Q.  Was it packaged separately from the heroin or with the

24   heroin?

25   A.  It was in -- with the heroin.

1    Q.  Other than the narcotics, heroin and crack and the cell

2    phones, did you recover anything else from the defendant?

3    A.  Cash.

4    Q.  Do you recall approximately how much cash you recovered?

5    A.  Approximately $2,300, 2,300.

6    Q.  Officer Kinane, following the arrest of the defendant, did

7    you swear to an affidavit in Bronx court?

8    A.  Yes, I did.

9    Q.  And in that affidavit did you swear that you observed the

10   defendant have on his person in his waistband 153 glassines of

11   hardcore and eight clear ziploc bags containing a white

12   rock-like substance?

13   A.  Yes.

14   Q.  What did you mean by that?

15   A.  I just meant at that time and place the defendant had on --

16   on him that amount of narcotics; not the recovery location,

17   just at that time when we had stopped him.

18   Q.  And at some point after the defendant's arrest did you also

19   go to grand jury in the Bronx and testify about the arrest of

20   the defendant?

21   A.  Yes.

22   Q.  And have you reviewed that grand jury testimony in

23   preparation for this hearing?

24   A.  Yes.

25   Q.  And did you testify to everything that you observed on that

1    day or just -- on that day meaning August 4, 2014 --

2    A.  Yes.

3    Q.  -- or were you just testifying to the questions that the

4    ADA asked of you?

5           MR. PAUL:  Objection, Judge.

6           THE COURT:  Wait a second.  Grounds?

7           MR. PAUL:  Leading.

8           THE COURT:  Overruled.  You may answer.

9           THE WITNESS:  I was -- I responded to direct questions

10   from the ADA, not getting into very specific details.

11   BY MS. CASTELLANO:

12   Q.  Did you testify truthfully, to the best of your

13   recollection, at that time?

14   A.  Yes, I did.

15   Q.  Did you testify about speaking to the defendant in the

16   lobby on Decatur Avenue?

17   A.  No, I did not.

18   Q.  And did you testify that you observed that the defendant --

19   the defendant make an exchange as you approached him on the

20   street?

21   A.  Yes.

22   Q.  And was that accurate?

23   A.  It -- I misspoke when I was in grand jury.

24          MR. PAUL:  I'm sorry?  I didn't hear the last part of

25   your answer.

G4EEMCDH                    Kinane - cross

1          THE WITNESS:  I said I had misspoke when I was in

2     grand jury.

3          MS. CASTELLANO:  Your Honor, may I have a moment?

4          THE COURT:  Yes.

5     BY MS. CASTELLANO:

6     Q.  Officer Kinane, just one more question.

7     A.  Yes.

8     Q.  A couple more questions.

9          Turning back to Government Exhibit 3, does that

10    contain all of the narcotics that you recovered from the

11    defendant on August 4, 2014?

12    A.  Yes, I believe so.

13    Q.  From the lobby and from the police vehicle?

14    A.  Yes.

15    Q.  And was it packaged that way when you recovered it?

16    A.  No.

17         MS. CASTELLANO:  No further questions, your Honor.

18         THE COURT:  All right.  Cross?

19    CROSS EXAMINATION

20    BY MR. PAUL:

21    Q.  Officer, you were just asked some questions about your

22    grand jury testimony.  Do you recall that?

23    A.  Yes, sir.

24    Q.  Now, you recall that the grand jury testimony you gave

25    concerning this arrest -- you were the arresting officer,

1    right?

2    A.   Yes.

3    Q.   You were the official arresting officer involved in this

4    case?

5    A.   Yes.

6    Q.   So that means you were the officer who not only made the

7    arrest but discussed with the Assistant District Attorney when

8    the charges were brought, filed all the appropriate papers and

9    documents attached to this arrest, right?

10   A.   Yes.

11   Q.   That was your responsibility?

12   A.   Yes.

13   Q.   Now, you testified just before that you do recall

14   testifying in the grand jury.  And do you recall when that was?

15   A.   I believe it was November or December of 2014.

16   Q.   To be exact, it was November 13, 2014.  Does that refresh

17   your recollection?

18   A.   Yes.

19   Q.   And you testified just now in your testimony today that you

20   did not tell the grand jury everything that you've told this

21   Court today; is that right?

22   A.   Correct.

23   Q.   Well, Officer, it's a fact, is it not, that at no time

24   during the course of either talking to the Assistant District

25   Attorney, testifying in the grand jury or any time leading up

1    to today's testimony that you discussed being inside a

2    building?

3    A.  No, we did not.  Not to my recollection.  Not that I

4    recall.

5    Q.  So your testimony in the grand jury was the fact that you

6    had seen with your binoculars, right -- you had binoculars that

7    day, right?

8    A.  Yes.

9    Q.  By the way, when an officer has binoculars, does that have

10   to be vouchered or issued in any official form?

11   A.  Not that I know of.

12   Q.  How long did you have those binoculars in your possession?

13   A.  Just for that period of time.

14   Q.  On that day?

15   A.  Yes.

16   Q.  So is there a mention anywhere in your memo book that you

17   would have been in possession of binoculars?

18   A.  No, I -- I wouldn't write that down.

19   Q.  And while you were on the rooftop -- you went to the

20   rooftop with your brother officer, right?

21   A.  Yes.

22   Q.  And it was your job to do the observation, his job to

23   secure the location on the rooftop, right?

24   A.  Yes.

25   Q.  Can you describe the rooftop that you were on?

G4EEMCDH                    Kinane - cross

1    A.   It's flat.   It overlooked Decatur Avenue from East Fordham

2    Road and 193rd.

3    Q.   Do you recall the color of the ground of the rooftop, by

4    any chance?

5    A.   I don't.

6    Q.   And when you looked out across the building you were on,

7    directly across, do you recall what you would see on Decatur?

8    A.   No, I don't.

9    Q.   Now, you said you're very familiar with Decatur Avenue,

10   right?

11   A.   Yes.

12   Q.   And you've made arrests on Decatur?

13   A.   Yes.

14   Q.   You've done verticals on Decatur?

15   A.   Yes.

16   Q.   This isn't the first time that you were doing any

17   observations on Decatur, right?

18   A.   Not -- not observations, but I've made arrests.   I've

19   watched people on that block, yes.

20   Q.   Was this the first time you were utilizing binoculars and

21   observing out on Decatur Avenue?

22   A.   This particular building, yes.

23   Q.   Was it the first time -- the question is:   Was it the first

24   time that you were involved, in your work as a police officer,

25   observing from a rooftop down onto Decatur Avenue?

1    A.  Yes.

2    Q.  Very first time, as best you can --

3    A.  If I had previously -- I may have.  I -- like I don't

4    remember, honestly.

5    Q.  Now, do you recall -- and you testified, you said that you

6    saw an individual approach Mr. McDow.  It turned out to be

7    Mr. McDow, this individual, on the block, is that right?

8    A.  Yes.

9    Q.  Where was Mr. McDow when this individual approached him?

10   A.  He was on Decatur, on Decatur Avenue.

11   Q.  Do you remember testifying in the grand jury that while you

12   were on the rooftop with binoculars watching the defendant, he

13   was on the street corner?

14   A.  I don't remember, no.

15   Q.  Let me show you what's been previously marked 3502-8.

16           MR. PAUL:  I'm sorry, Judge.  I should have asked the

17   Court.

18   Q.  Could you read your question.  Without any detail, the

19   question is, briefly describe the circumstances leading up to

20   the arrest of James McDow.

21           Do you want to read that answer to me?

22   A.  The place of occurrence --

23   Q.  Read it to yourself.  (Pause)

24           Do you remember now telling the grand jury that you

25   saw McDow on the corner of that street?

1    A.  I don't remember testifying to the corner, no.

2    Q.  Now, you testified that the building you were looking down

3    on was on the corner of 193rd and Decatur, right?

4    A.  Yes.

5    Q.  Was it right on the corner?  Was it on the other side of

6    193rd Street?  Was it --

7    A.  When I'm --

8    Q.  -- closer to Burlington department store?

9    A.  Sir, what I gave as the address was the arrest location of

10   Mr. McDow.  What I was -- when I was observing, that wasn't the

11   exact location where he was.  It's a pretty long block.  I

12   don't recall the exact location where he was.

13   Q.  I'm asking where you were on the rooftop, the building.

14   A.  Yes.

15   Q.  The question is:  Do you recall, as you sit here now,

16   whether the building was on that corner of Decatur and 193rd,

17   or was it on the following, the next corner down from 193rd, or

18   even closer to the department store across the street?

19   A.  The corner of East 193rd and Decatur.

20   Q.  Okay.  And when you observed him, you said that in the --

21   you were up there approximately, I think you testified, how

22   long?

23   A.  Forty-five minutes; an hour, possibly.

24   Q.  Do you remember testifying that you were up there

25   approximately 30 minutes in the grand jury?

1    A.   I don't remember, no.

2    Q.   If I showed you your testimony, would that refresh your

3    recollection?

4    A.   You can show me my testimony.

5    Q.   Again, I'm showing you 3502-8.  Why don't you read the

6    whole answer.

7              THE COURT:  What page?

8              MR. PAUL:  JG4, starting at line 6 as an answer.

9    Q.   Read the whole thing.

10   A.   Yes.

11   Q.   Does that refresh your recollection that you told the grand

12   jury that you were up there approximately 30 minutes?

13   A.   Yes.

14   Q.   And after 30 minutes, or during that 30 minutes, you say

15   you saw one exchange or more than one?

16   A.   It -- at this time I don't remember.  My grand jury minutes

17   stated approximately three.  I don't remember how many right

18   now to this -- to my memory.

19   Q.   And your testimony is that you do recall misspeaking in the

20   grand jury when you testified that on your way to the street,

21   you observed him on the street -- meaning the defendant --

22   exchanging US currency for objects.  Right?

23   A.   Yes.

24   Q.   That, you misspoke about?

25   A.   Yes.

1  Q.  That didn't happen?

2  A.  No, I -- it was --

3  Q.  You didn't see that?

4  A.  No.

5  Q.  And you testified that you now leave -- you're describing

6  this to your brother officer while you're up there, right, what

7  you're observing on Decatur?

8  A.  Yes.

9  Q.  And did you give a description of the individual that you

10  were observing named -- make this one exchange with another

11  individual?

12  A.  Of -- yeah, brief description.

13  Q.  What was that brief description?

14  A.  Large, large person, large individual.  He was wearing like

15  a white -- or -- white T-shirt possibly.  I don't remember

16  exactly.

17  Q.  When you were observing Mr. McDow on the street on the

18  block of Decatur, was he standing alone or was he with other

19  individuals?  Do you recall?

20  A.  I don't remember, sir.

21  Q.  Now, you have -- withdrawn.

22          When you approached, got in the car, drove to the

23  location, you acknowledge now, do you not, that the location

24  you say that he was in front of and you went into was the wrong

25  address that you indicated; specifically, 2563 is not the

1    address, right?

2    A.  Is that -- I -- I'm wrong in --

3    Q.  I'm asking you.

4    A.  Yes, it's possible.

5    Q.  Well, let me show you on the photograph, with the Court's

6    permission.  This is Exhibit B and C, defendant's.

7    A.  Okay.

8    Q.  Does that refresh your recollection as to the building of

9    where you approached Mr. McDow and then eventually went inside

10   the building with you?

11   A.  Yes.

12   Q.  Which building was it?

13   A.  I believe it would have been 2559.

14   Q.  So it's fair to say then, Officer, that all your paperwork

15   and indications that this arrest took place in front of 2563

16   was inaccurate, right?

17   A.  Yes.  I made a clerical mistake in my paperwork.

18   Q.  You said it more than once, right?

19   A.  Right.  I thought that's where we had stopped him.

20   Q.  But this is a location you're very familiar with, right?

21   A.  Yeah.  I'm familiar with it, but --

22   Q.  You have since seen a video, have you not?

23   A.  Yes.

24   Q.  That was a video shown to you by the US Attorney's Office,

25   correct?

1    A.   Yes.

2    Q.   And is it fair to say, Officer, that you went through this

3    video and observed and was asked by the assistant US attorney

4    to go through it, look at it, and then she discussed it with

5    you, did she not?

6    A.   Yes, she did.

7    Q.   And you were not aware of any video ever having been taken

8    of that arrest, were you?

9    A.   No.

10   Q.   Now, by the way, when you pulled up on Mr. McDow in front

11   of what turns out to be 2559 Decatur, did you arrest him at

12   that point?

13   A.   At that point he was not in handcuffs, no.

14   Q.   I didn't ask you that.  Was he free to go?

15   A.   No, he was not.

16   Q.   Did you arrest him for the sale that you told us you saw?

17   A.   At this point when --

18   Q.   At any point.

19   A.   Yes.

20   Q.   You arrested him for a criminal sale of a controlled

21   substance?

22   A.   He was detained at this point.

23   Q.   My question is, sir:  Did you ever arrest Mr. McDow for a

24   criminal sale of a controlled substance in the third degree, a

25   D felony?

G4EEMCDH                    Kinane - cross

1    A.  Yes.

2    Q.  Are you certain of that?

3    A.  That's --

4    Q.  Do you want to look at the criminal complaint that you

5    swore an affidavit to?

6    A.  Sure.

7    Q.  Showing you what's been previously marked as 3502-13.  Do

8    you want to look at "committed the offenses of"?

9    A.  Yes.

10   Q.  Does that anywhere indicate that Mr. McDow was arrested for

11   a criminal sale of a controlled substance?

12   A.  No.

13   Q.  And yet is it fair to say, Officer, since you say you had

14   seen an exchange on the street when you approached Mr. McDow,

15   you could have very well, according to your testimony, arrested

16   him for criminal sale of a controlled substance?

17           THE COURT:  I'm sorry.  I don't remember that

18   testimony.

19           MR. PAUL:  No, I'm asking him.

20           THE COURT:  Well, then there's no foundation.

21   Q.  Is it your -- withdrawn.

22           Is it correct to say that when you pulled up on

23   Mr. McDow on Decatur Avenue -- this was after you had seen an

24   exchange, according to your testimony, of an item and cash,

25   right?

G4EEMCDH                    Kinane - cross

A.  Accord --

Q.  At least one exchange?

A.  According to my testimony, from what I remember.

Q.  And that's called a criminal sale of a controlled

substance, is it not?

A.  Yes.

          THE COURT:  I'm sorry.  Where were you when you saw

this exchange?

          THE WITNESS:  Your Honor, what -- I was on the roof.

          THE COURT:  This is a rooftop, right?

          THE WITNESS:  Right.

          THE COURT:  This is not him pulling up in a car?

          THE WITNESS:  No.

          MR. PAUL:  No.  No.  My question is, Judge, when he

pulled up in the car, could he not have arrested Mr. McDow for

criminal sale of a controlled substance at that very moment?

          THE COURT:  I found your questions confusing, because

it sounded to me like you were suggesting that he observed

something as he pulled up in a car, and that provided the basis

for an arrest.

          But that's not what you're trying to ask, right?

          MR. PAUL:  No.  That's correct.

          But he's already testified that even though previously

he had indicated that was the case, his recollection now was

that he misspoke in the grand jury when he talked about pulling

1    up and having seen an exchange on the street at that time.  I'm

2    talking about his observation from the rooftop.

3    BY MR. PAUL:

4    Q.  Where you saw an exchange --

5    A.  Yes.

6    Q.  -- correct, which is called a criminal sale of a

7    controlled substance?

8    A.  Yes.

9    Q.  And you then left the car, right?

10   A.  Yes.

11   Q.  I mean, you left to go in the car?

12   A.  Yes.

13   Q.  You drove to 25 -- turns out to be 2559 Decatur, not 2563,

14   right?

15   A.  Yes.

16   Q.  You get out of the car.  You approach Mr. McDow?

17   A.  Yes.

18   Q.  But your testimony is even though he was not free to leave

19   at that moment, he was not officially being arrested for the

20   criminal sale of a controlled substance; is that right, or is

21   it not?

22   A.  We stopped him on the basis that I -- we believed that he

23   was distributing narcotics.

24   Q.  Okay.  Now, having seen the video, sir, we now know that

25   you were inside of that building for quite some time with

1    Mr. McDow.  Is that fair to say?

2    A.  It's fair to say.

3    Q.  And, in fact, would it be fair to say you were inside with

4    you and your brother officer Mr. McDow for approximately five

5    to six minutes, if not more, right?

6    A.  Officer Gembecki.

7    Q.  Who did I say, McDow?  I'm sorry, Officer Gembecki.

8         Is that right?

9    A.  Yes.

10   Q.  Now, you've seen the -- withdrawn.

11        Sir, do you recall being asked in the grand jury --

12   referring again to JG4 of 3502-8 --

13   "Q  (Line 19)  Then after making these observations, what, if

14   anything, did you do?

15   "A  After my observations and upon my way to the street, we

16   observed him on the street exchanging US currency for objects."

17        That's misspoken, right, you've indicated, right?

18   A.  Yes.

19   Q.  We approached him.  We asked him what he was doing on the

20   street, if he had anything illegal on him.

21        Who said that to him, you or your brother officer?

22   A.  I don't know.  I don't remember, sir.

23   Q.  The defendant had stated, in sum and substance, he had a

24   few Bs and a couple of crills, at which time the defendant had

25   in between his belt and waistband and then pulled out a bundle

1   of heroin, which was approximately ten glassine envelopes.

2           Do you remember that answer?

3   A.  Do I remember what, sir?

4   Q.  That question and answer in the grand jury.

5   A.  No.  I don't remember answering at the time.  I --

6   Q.  That doesn't refresh your recollection?

7   A.  It refreshes my recollection, yes.

8   Q.  It does?

9   A.  Yes.

10  Q.  Okay.  And is that accurate, you did say that to the grand

11  jury?

12  A.  Yes.

13  Q.  We placed the defendant in custody, placed him in

14  handcuffs, and he was frisked before being placed into the

15  patrol car.

16          Do you recall that question and answer or that answer

17  you gave?

18  A.  Yes.

19  Q.  "What occurred during the frisk?

20  "A  I felt an object on under -- on the defendant's left side.

21  "Q  What did you believe that object to be?

22  "A  I believed the object to be additional narcotics."

23          Do you remember that question and answer?

24  A.  Yes.

25  Q.  So where did this frisk take place, that you noticed an

G4EEMCDH                    Kinane - cross

1    additional object on his possession?

2    A.   I -- I don't remember, sir.

3    Q.   Well, was it on the street or was it in the building?

4    A.   It was probably in the building, I would say.

5    Q.   Because you didn't see it on the video, did you?

6    A.   No, I didn't see it on the video, no.

7    Q.   You did observe -- you were standing behind Mr. McDow when

8    you approached him, right?

9    A.   Yes.

10   Q.   And was that for securing that location so that he could

11   not leave?

12   A.   Yes.

13   Q.   And your brother officer then, you noticed from looking at

14   the video, started looking into Mr. McDow's pockets?

15   A.   Yes.

16   Q.   You saw it?

17   A.   In the video, yes.

18   Q.   And at some point the three of you entered inside 2559

19   Decatur, right?

20   A.   Yes.

21   Q.   And is it your testimony or -- withdrawn.

22        What is the reason you entered into 2559 Decatur?

23   A.   I don't -- I don't remember whether it was on Mr. McDow's

24   request or our request to enter the building.  I don't -- I

25   don't remember.

1    Q.  But nevertheless, all three of you -- he opened the door to

2    let you in, right?

3    A.  Yes.

4    Q.  You saw that on the video as well?

5    A.  Yes.

6    Q.  And then you were inside, and it's your recollection that

7    there was further conversations with him?

8    A.  Yes.

9    Q.  And is it your testimony that that's where there was a

10   frisk that occurred before you took him to the patrol car?

11   A.  Yes.

12   Q.  And that would have been a fairly thorough frisk, would it

13   not, because you're about to put him in handcuffs and put him

14   in the patrol car?

15   A.  Yes.

16   Q.  So do you recall doing that?

17   A.  I recall a frisk being performed.  I don't recall who, my

18   partner or I, who frisked or searched Mr. McDow.

19   Q.  But it would be fair to say, would it not, Officer, that

20   it's standard procedure that that would be a thorough --

21   A.  Yes.

22   Q.  -- frisk?

23   A.  Yes.

24   Q.  Was anything recovered at that frisk, at that time?

25   A.  One bundle of heroin.

1    Q.  One bundle.  That's the bundle that he handed over to you

2    or you or your brother officer removed, right?

3    A.  That's the bundle that was recovered in the lobby, yes.

4    Q.  Do you remember patting him down and frisking him and

5    feeling anything else on his possession?

6    A.  No.

7    Q.  Do you remember testifying in the grand jury on page JG5,

8    what, if anything, occurred after you removed the ten glassine

9    envelopes --

10              THE COURT:  Sorry.  You've got to give a line number.

11              MR. PAUL:  I'm sorry, Judge.  Line 6.

12   "Q  Then what, if anything, occurred after he removed the ten

13   glassine envelopes containing the heroin from his waistband?

14   "A  We placed the defendant in custody, placed him in

15   handcuffs, and he was frisked before being placed into the

16   patrol car.

17   "Q  Did you -- what occurred during the frisk?

18   "A  I felt an object on -- under -- on the defendant's left

19   side.

20   "Q  What did you believe that object to be?

21   "A  I believed the object to be additional narcotics."

22              Do you remember those questions and answers?

23   A.  I remember it from you refreshing my memory, yes.

24   Q.  Is it a fact, sir, is it your testimony that when you

25   frisked him thoroughly before going into the patrol car, that

G4EEMCDH                    Kinane - cross

1   you recall feeling another object?

2   A.  As I said, I -- I don't remember, sir.

3   Q.  You don't recall it?

4   A.  I don't.

5   Q.  But you did testify to that?

6   A.  Yes, I testified to that.

7   Q.  Now, as you noticed in the video, Mr. McDow was handcuffed

8   to his rear, right?

9   A.  Yes.

10  Q.  And you said he had double handcuffs?

11  A.  Yes.

12  Q.  Right?

13  A.  Yes.

14  Q.  Was that in any time -- at any time changed?  Was his

15  position changed with regard to his handcuffing?

16  A.  Not that I remember, no.

17  Q.  Do you remember testifying in the grand jury -- this is now

18  referring to JG6 -- about his discussion with you about being

19  on parole?  You testified, then, on line 14:

20  "Q  After he made that statement to you, what, if anything

21  occurred?

22  "A  After that the defendant was handcuffed like this."

23          Would that have been to his rear?

24  A.  Yes.

25  Q.  You described that to the grand jury?

1    A.  Yes.

2    Q.  "Q  What happened?

3    "A  He started to --

4    "Q  Where was he handcuffed?

5    "A  He was rear handcuffed."

6           Is that correct?

7    A.  Yes.

8    Q.  And it's your testimony that when he got in the patrol car,

9    he was able to maneuver to get this item that he told you he

10   had on him out of his pants, right, or out of his wherever it

11   was located inside his pants?

12   A.  Yes.

13   Q.  And was that in the -- on the left side or the right side,

14   as best you can recall?

15   A.  The -- I believe it was his left side.

16   Q.  He's sitting next to you in the back, I assume?

17   A.  Yes.

18   Q.  And he was able to pull out this item from the left side?

19   A.  Yes.

20   Q.  When he -- you told us that he made a statement at some

21   point, whether it was outside or inside the building, that he

22   had a couple of Bs and a couple of crills?

23   A.  Yes.

24   Q.  A couple of Bs would have been 20 bags of heroin, right?  A

25   B is a bundle?

A.   A B is a bundle, yes.

Q.   There's ten glassines to a bundle?

A.   Yes.

Q.   So a couple would mean there would be 20 glassine

envelopes?

A.   Yes.

Q.   And crills, what's -- crill is --

A.   Crack cocaine.

Q.   And when someone says, I want or I have a crill, is that

just one crack bottle or is there -- or envelope, or is there

more?

A.   I -- I guess you could say, I want a crill, you know, it

would be one.  A couple would be two.

Q.   And when you did remove -- whether he gave it to you or you

took it, the bundle, that was the extent of what you removed,

right; one bundle, meaning ten glassine envelopes, right?

A.   One bundle from which location, sir?

Q.   Whether it was on the street or inside the building, before

you took him to the patrol car.

A.   Before Mr. McDow was taken in the patrol car, one bundle of

heroin was removed.

Q.   And that's the full extent of what was removed from him at

that point?

A.   At that point, yes.

Q.   But there was no crack, and there weren't 20 --

1    A.  There was no crack --

2    Q.  -- 20 envelopes?

3    A.  No.

4           THE COURT:  Now, you testified, though, that when you

5    frisked him before he was put into the patrol car, you felt

6    something on his side, right?

7           THE WITNESS:  I mean, I don't --

8           THE COURT:  You don't know?

9           THE WITNESS:  I don't remember whether it was my

10   partner or me who frisked him at the time.  I really --

11          MR. PAUL:  I'm sorry.  I didn't hear the exchange,

12   Judge.

13   BY MR. PAUL:

14   Q.  You do not, as you sit here now, recall feeling something

15   when you frisked him before taking him to the patrol car?

16   A.  No.  I'm saying I don't remember -- I don't recall if it

17   was my partner or me who actually frisked or searched Mr. McDow

18   at this point.

19   Q.  Well, do you remember testifying in the grand jury that, in

20   fact, it was you who felt an item?

21   A.  I remember testifying, but right now I don't -- I don't

22   remember.

23   Q.  You've reviewed your grand jury testimony, have you not?

24   A.  Yes, sir.

25   Q.  This isn't the first time you're being asked questions

1    about it, right?

2    A.  No.

3         THE COURT:  Whether it was you or Officer Gembecki who

4    frisked him before he went into the patrol car, did either of

5    you remove any additional narcotics from Mr. McDow?

6         THE WITNESS:  No.  No, your Honor.  It was the one

7    bundle at this point that was removed.  No additional

8    narcotics.

9    Q.  Since you have no recollection whether it was you or

10   Officer Gembecki, you can't describe what you felt if it was,

11   in fact, you?

12   A.  No.

13   Q.  But you do know that at no time anything other than the one

14   bundle before getting in the patrol car was recovered by either

15   you or your brother officer?

16   A.  Yes, right.

17        MR. PAUL:  Give me one second, Judge.  (Pause)

18   Q.  Officer, you were the officer who vouchered all of these

19   items, right?  Whether it be the drugs, the money, the cell

20   phones, it was your responsibility, right?

21   A.  Yes, sir.

22   Q.  And do you recall approximately what time it was that you

23   returned to the precinct with Mr. McDow?

24   A.  Approximately 6:00 something, sir.  I don't remember

25   exactly.

1    Q.  Now, up until the time you'd gotten to the precinct, it's

2    your testimony at no time during this entire period that we've

3    discussed you gave Mr. McDow his Miranda rights, is that right?

4    A.  That's right.

5    Q.  Nor did your brother officer in your presence?

6    A.  No.

7    Q.  Was he ever given his Miranda rights?

8    A.  He was.

9    Q.  When was that?

10   A.  When he was interviewed by the detective squad in the 52nd

11   precinct.

12   Q.  And did he make a statement then?

13   A.  He did.

14         MR. PAUL:  Have I been provided that statement?  I'm

15   asking the government.

16         (Discussion held off the record)

17   BY MR. PAUL:

18   Q.  Officer, I'm sorry.  Do you recall what time -- I think I

19   asked you what time it was that you returned and got back to

20   the precinct with Mr. McDow in your custody.

21   A.  I said 6:00 something, sir.  I don't remember the exact --

22   Q.  Well, if the arrest took place I believe, according to your

23   records, at 6:40, do you recall approximately how much later

24   you got to the precinct?

25   A.  I'd say maybe -- it's a short ride.  Maybe five minutes, if

1    that.

2    Q.  So certainly before 7:00 at night?

3    A.  I would say, yes.

4    Q.  And you then start filling out the paperwork and vouchering

5    and all of that?

6    A.  Yes.

7    Q.  And the phones, were those taken from him when he got back

8    to the precinct with you?

9    A.  Yes.

10   Q.  And his money was also taken from him as well, right?

11   A.  Yes, it was.

12   Q.  Are you aware, by the way, that this $2,300 was returned to

13   Mr. McDow?

14   A.  No.

15   Q.  Once the phones were removed from him -- and I assume that

16   would have been shortly after he returned to the precinct -- at

17   some point thereafter, they're vouchered and placed in property

18   clerk's office, right?

19   A.  Yes, sir.

20   Q.  And you fill out an invoice for that purpose?

21   A.  Yes.

22   Q.  Certainly Mr. McDow would no longer have possession of

23   those phones once you returned to the precinct, right?

24   A.  Right.

25   Q.  And you recall removing those almost immediately or

1   certainly shortly after?

2   A.  At some point when we were probably doing his property

3   inventory, yes, we removed the phones.

4   Q.  Before you place anybody in a patrol car who is being

5   handcuffed, I assume you've testified you do a thorough frisk

6   and/or search, right?

7   A.  Usually, sir, yes, that's what you do before you place

8   somebody in the --

9   Q.  Do you remember doing that in this case?

10  A.  I don't remember exactly who frisked or searched Mr. McDow.

11  Q.  But the normal procedure would be that before placing

12  anybody in the patrol car, it's a full search?  You go into

13  their pockets, you do a search?

14  A.  Yes.

15  Q.  And it's fair to say, then, that that was done in this

16  arrest as well?

17  A.  It's fair to say, yes.

18  Q.  Do you recall telling the grand jury, you specifically

19  feeling a hard object on the left side of Mr. McDow when you

20  frisked him?

21          MS. CASTELLANO:  Objection, your Honor.

22          THE COURT:  Grounds?

23          MS. CASTELLANO:  Asked and answered.

24          THE COURT:  Overruled.

25  A.  From refreshing my recollection and -- yes.  Do I remember

1   testifying to it?  No.

2   Q.  Okay.  I'm referring to JG10, line 4:

3   "Q  So you went into his pocket, ankles and waist area?

4   "A  Yes.

5   "Q  You felt a hard object on the left side of -- you said you

6   felt it when you frisked the defendant.  What, if anything, did

7   you feel at that point?

8   "A  I felt the object.  He already stated that he had

9   additional narcotics on him."

10          Do you remember that question and that answer?

11  A.  Yes.

12  Q.  But it's your testimony, is it not, that he had not stated

13  to you or your partner that he had anything additional other

14  than the two Bs, or couple of Bs and the crill before he got

15  into the patrol car, right?

16  A.  I'm -- again, I don't remember exactly when Mr. McDow made

17  that statement, sir.  That was at some point.

18  Q.  You don't know when he made which statement?

19  A.  That he had a couple Bs, couple crills.  I don't remember

20  exactly when he made that statement.

21  Q.  Could it have been in the patrol car?

22  A.  It could have been.  I just remember the statement.

23  Q.  Well, let's get back to the hard object.  Do you remember

24  telling the grand jury that you felt a hard object on his left

25  side?

1    A.  Yes.

2    Q.  And I think you testified specifically where you felt it,

3    right?

4    A.  Yes.

5    Q.  And yet you didn't remove it, right?

6    A.  No.

7    Q.  And could you describe in any way with your hands as to the

8    item that was ultimately removed inside that patrol car by

9    Mr. McDow, according to your testimony?

10   A.  The item was a rather large brick of heroin.

11   Q.  I'm sorry?

12   A.  It was a large brick of heroin.

13   Q.  Again, I didn't hear you.  A large?

14   A.  A large thing of heroin.

15   Q.  Well, you have two hands together.  Would you hold it up

16   for the judge to see in terms of the size of the item.

17            THE WITNESS:  Probably about that big, your Honor.

18            THE COURT:  So how many inches long and how many --

19            THE WITNESS:  I'd say it was probably six, about six

20   inches possibly.

21            THE COURT:  And, what, a couple inches in depth?

22            THE WITNESS:  Yeah.  Three, three or four inches.

23   BY MR. PAUL:

24   Q.  And that was the item that he managed to remove from his

25   pants that neither you or your brother officer had previously

1   removed, right?

2   A.  Yes.

3           THE COURT:  And this was, you said, a brick, but these

4   are bundles of heroin with a rubber band around?

5           THE WITNESS:  Yes, your Honor.  It's -- excuse me.

6   It's not a brick.  It was just the bundles.  They were packaged

7   in like a cellophane all together.  So it came out all as one,

8   but it was separate bundles, within that --

9           THE COURT:  And was there a rubber band holding it

10  together, or you don't remember?

11          THE WITNESS:  There was small rubber bands holding

12  each bundle together.  I don't remember if there was one other

13  rubber band on the outside holding it all, but that was all --

14          THE COURT:  Cellophane.

15          THE WITNESS:  -- cellophanes and the additional -- the

16  crack cocaine was in with that.

17          THE COURT:  Okay.

18          MR. PAUL:  I think I'm almost done, Judge.

19  BY MR. PAUL:

20  Q.  Would it be fair to say, Officer, that the first time you

21  saw this video was in the presence of both these assistant US

22  attorneys on April 11th, just a few days ago?

23  A.  Yes.

24  Q.  And you viewed the whole video, right?

25  A.  Yes.

G4EEMCDH                    Kinane - cross

1   Q.  And that's obviously fair to say also that that's --

2   withdrawn.

3            Just a couple of questions, Officer.

4            You made a number of arrests dealing with narcotics,

5   right?

6   A.  I have.

7   Q.  You're very familiar with bundles and crills and what we've

8   been discussing, right?

9   A.  Yes.

10  Q.  There were, according to your testimony and what was

11  vouchered, 153 envelopes of heroin?

12  A.  Yes.

13  Q.  That would be 15 bundles, right?

14  A.  Yes, approximately.

15  Q.  At least?

16  A.  Yes, approximately.

17  Q.  Even a little larger, right?

18  A.  Yes.

19  Q.  And one bundle is approximately -- if you could describe

20  the size of what would be one bundle in length, 10 envelopes,

21  approximately.

22  A.  Approximately three, four inches maybe in length.

23  Q.  One bundle.

24  A.  One.

25  Q.  And this was 15 bundles?

1   A.  Yes.

2   Q.  So that would be 3 times 15 --

3   A.  Yes.

4   Q.  -- in length?

5   A.  Yes.

6          THE COURT:  I don't know what you mean by "length."  I

7   don't know what --

8          MR. PAUL:  Well, you described --

9          THE COURT:  I just don't understand what that question

10  means.

11  Q.  Could you show us with your fingers what the size

12  approximately of what one bundle would look like?

13         THE COURT:  Are you talking about the width, is that

14  what you're talking about?  Because length is this way.  Width

15  is that way.

16         MR. PAUL:  Let's try length.

17         THE COURT:  So if you put them edge to edge, how many

18  inches would it be?  Is that what you're --

19         MR. PAUL:  Aren't they usually in a --

20         THE COURT:  That's not length.  That's what I'm

21  talking to you about.  That's not length.  You're talking about

22  width.

23         MR. PAUL:  Okay.  Is there any way to look in that

24  envelope and describe what ten glassine envelopes would look

25  like?

1           THE COURT:  So if you stacked up ten glassine

2    envelopes, one on top of the other, how wide would that be

3    or -- width is probably not the right word, but you know what I

4    mean.  You stack them up, ten of them --

5           THE WITNESS:  I'd say four or five inches.

6           THE COURT:  Ten glassines?

7           THE WITNESS:  Ten?

8           MR. PAUL:  The judge isn't talking about putting them

9    side by side.

10          THE COURT:  Is that what you want?  Do you want them

11   side by side?

12          MR. PAUL:  No.

13          THE COURT:  I didn't think so.  Okay.  So --

14          THE WITNESS:  It would be about -- that would be about

15   a bundle.

16          THE COURT:  So about an inch?

17          THE WITNESS:  Yeah.

18          THE COURT:  About an inch.

19   BY MR. PAUL:

20   Q.  If you took 15 bundles, we're talking about 15 inches,

21   right?

22   A.  Yes.

23   Q.  Is that fair to say?

24   A.  It's fair to say.

25          MR. PAUL:  Nothing further.

1           THE COURT:  All right.  Redirect?

2           MS. CASTELLANO:  Yes, your Honor.  Could I have one

3  moment.

4  REDIRECT EXAMINATION

5  BY MS. CASTELLANO:

6  Q.  Officer Kinane, can I direct you back to Government

7  Exhibit 3, please.

8  A.  Yes.

9           MS. CASTELLANO:  Your Honor, may I approach?

10          THE COURT:  Yes.

11  Q.  Officer, I'm looking at Government Exhibit 3.  Can you

12  describe what one glassine looks like in there?

13  A.  One glassine as far as what?

14  Q.  Well, is it a piece of paper?

15  A.  Yeah.  It's like a wax, a watch --

16          THE COURT:  I know what a glassine looks like.  I

17  don't need the officer to tell me what a glassine looks like.

18  I'm very familiar, so I know that.

19  Q.  Officer Kinane, you testified that when you recovered the

20  defendant -- the narcotics in the vehicle, that there were

21  several bundles, right?

22  A.  Yes.

23  Q.  And were the bundles all stacked on top of each other or

24  were some next to each other?

25  A.  They were stacked in -- they were stacked next to each

1   other in one line.

2   Q.  One line, so that each glassine was on top of the other?

3   A.  Yes.  Yes.  Yes.

4   Q.  And when the heroin is in those glassine envelopes, does it

5   fill up the glassine very much, or is it a very thin envelope?

6   A.  It's a very thin envelope.

7   Q.  And so when ten glassines are stacked together and rubber

8   banded, is it fairly narrow?  Is it not that high?

9   A.  Yes.

10  Q.  So when ten of those bundles are packaged together,

11  approximately all on top of each other, approximately how high

12  is that stack?

13  A.  It's approximately that high.

14  Q.  Is that about six inches?

15  A.  Yeah, about six; five, six inches.

16  Q.  And is that what the narcotics that you recovered from the

17  defendant in the car looked like that day?

18  A.  Yes, approximately that size.

19  Q.  Officer Kinane, you testified before about speaking to the

20  defendant, along with your partner, on Decatur Avenue, right?

21  A.  Yes.

22  Q.  And about speaking with the defendant in the lobby of the

23  building, is that right?

24  A.  Yes.

25  Q.  And do you recall whether -- 2559 Decatur Avenue or 2563

1   Decatur Avenue are right next door to each other, aren't they?

2   A.  Yes, they are.

3   Q.  Do the buildings look the same?

4   A.  Yes, they look very similar.

5   Q.  Do the doors to the buildings look the same to 2559 to

6   2563?

7   A.  Yes.  They also look similar.

8   Q.  Are the doors very close to each other?

9   A.  Yes, they are.

10  Q.  And going back to the drugs that you recovered from the

11  defendant in the vehicle, do you know where the defendant had

12  hidden those drugs on his person?  Do you know where they were

13  hidden before he inched them out?

14  A.  They were inside of his pants on -- there was -- under

15  his -- his pants, inside.

16  Q.  Do you know exactly where they were?

17  A.  Just on his -- on his left side in a --

18  Q.  In his underwear?

19  A.  By -- they may have been.  I honestly don't remember.  I

20  just know they were -- they were in -- inside of his pants.  I

21  don't remember if they were under the underpants or not.

22  Q.  And in searching someone before you get in your police

23  vehicle, do you usually go inside someone's underwear?

24  A.  No.

25  Q.  Do you feel underneath, inside their pants?

1   A.  No.

2   Q.  Were the defendant's pants that he was wearing that day,

3   were they tight or were they baggy?

4   A.  I would say they were fairly baggy.

5           MS. CASTELLANO:  No further questions, your Honor.

6           THE COURT:  Anything else?

7           MR. PAUL:  No further questions.

8           THE COURT:  You can step down, Officer.

9           THE WITNESS:  Thank you, your Honor.

10          (Witness excused)

11          THE COURT:  Does the government have any more

12  evidence?

13          MS. CASTELLANO:  Your Honor, we have a stipulation.

14          THE COURT:  All right.

15          MS. CASTELLANO:  Should I read it into the record,

16  your Honor?  It's in your binder marked for identification as

17  Government Exhibit 6.  I'm happy to hand up a copy, if your

18  Honor doesn't have one.

19          THE COURT:  I have it.  Thank you.  You can read it

20  into the record, if you wish.

21          MS. CASTELLANO:  Yes, your Honor.

22          It is hereby stipulated and agreed, by and among the

23  United States of America, by Preet Bharara, United States

24  Attorney for the Southern District of New York, Gina Castellano

25  and Richard Cooper, Assistant United States Attorneys of

1    counsel, and James McDow, the defendant, with the consent of

2    his attorney, Kenneth Paul, that Government Exhibit 5 contains

3    a true and correct copy of data extracted from the HTC cellular

4    telephone, with international mobile subscriber identity

5    310002012158761 contained in Government Exhibit 4.  And that

6    this stipulation may be received in evidence in the hearing

7    scheduled for April 14, 2016.

8              And it's signed by the parties.

9              THE COURT:  All right.  Any other evidence?

10             MS. CASTELLANO:  And, your Honor, the government

11   offers Government Exhibit 5, which is also in your Honor's

12   binder, as well as --

13             MR. PAUL:  Objection.

14             MS. CASTELLANO:  As well as --

15             MR. PAUL:  I'm objecting to that exhibit, Judge.

16             THE COURT:  Well, I'm not really clear on what

17   Government Exhibit 5 is.  What is Government Exhibit 5?

18             MS. CASTELLANO:  Government Exhibit 5 contains text

19   messages from the phone that -- from Government Exhibit 4 that

20   was recovered from the defendant on the day of his arrest.

21   These are certain text messages from the day of his arrest,

22   August 4, 2014.  And there are text messages received and sent.

23             THE COURT:  What's the basis for your objection,

24   Mr. Paul?

25             MR. PAUL:  Judge, Mr. McDow was arrested at 6:40 p.m.

1    on August 4, 2014.  These texts are not at any time at or about

2    the time -- I assume the government's attempting to offer this

3    to corroborate the officer's testimony as to what, if anything,

4    was happening on Decatur.

5              It's interesting that these are timed at 9:58 and

6    later.  Unless the police officers are texting, it's unclear to

7    me who's responding and who's reading this, because at

8    approximately 7:00 or shortly thereafter, according to this

9    officer, the phones were vouchered.

10             MS. CASTELLANO:  Your Honor, if I may, the text

11   messages are -- the time is UTC time, which I believe your

12   Honor can take judicial notice of the fact that UTC time is

13   four hours ahead.

14             THE COURT:  I'm going to need testimony on this.  I

15   can't take your word for it.  You can't testify.  So if you

16   want me to consider this, you're going to have to call a

17   witness who can, first of all, testify to what these are and

18   the circumstances under which they were recovered, and what the

19   time stamp means.  I can't take your word for it.

20             So is that your wish?  Do you want to introduce these

21   text messages?

22             MS. CASTELLANO:  Could I have one moment, your Honor.

23             THE COURT:  Yes.  (Pause)

24             MR. COOPER:  Your Honor, we can call Special Agent

25   Ziegler from Homeland Security investigations on this topic.

1          THE COURT:  All right.

2          MR. COOPER:  If we may.

3          THE COURT:  Are you prepared now?

4          MR. COOPER:  She'll be a very brief witness, your

5    Honor.

6          THE COURT:  All right.

7     KELLY ZIEGLER,

8          called as a witness by the Government,

9          having been duly sworn, testified as follows:

10   DIRECT EXAMINATION

11   BY MR. COOPER:

12   Q.  Special Agent Ziegler, where are you employed?

13   A.  Homeland Security investigations as part of Homeland

14   Security in New York City.

15   Q.  What's your title there?

16   A.  Special agent.

17   Q.  How long have you been so employed?

18   A.  As a special agent, for three-and-a-half, four years

19   almost.

20   Q.  And what's your current assignment?

21   A.  I'm a narcotics investigator for Department of Homeland

22   Security.

23   Q.  Can you please describe for the Court what some of your

24   duties and responsibilities are as a narcotics investigator and

25   special agent in that unit.

1    A.   I conduct surveillance, arrests and long-term

2    investigations regarding narcotics.

3    Q.   As part of your job responsibilities and your

4    investigations, do you also review cell phone analyses?

5    A.   Yes, I do.

6    Q.   And have you been involved in this investigation, the

7    investigation of the defendant, James McDow?

8    A.   Yes, I have.

9            MR. COOPER:  Your Honor, may I approach.

10            THE COURT:  Yes.

11   Q.   I'm handing you what's been marked for identification as

12   Government Exhibit 5.  Do you recognize this?

13   A.   I do.

14   Q.   If you could just take a moment and look at the various

15   columns and the various rows.  To be clear, have you seen the

16   data in this particular format on Government Exhibit 5 before

17   today?

18   A.   I have not.  I have reviewed a spreadsheet, a spreadsheet

19   similar to this, but not this exact one.

20   Q.   Does that spreadsheet contain all text messages recovered

21   from one of the defendant's phones on his arrest in 2014?

22   A.   Yes, the one that -- the spreadsheet I previously reviewed

23   contains all the text messages from McDow's phone.

24   Q.   In the course of your previous narcotics investigations,

25   investigations overall, have you reviewed phone reports like

1    this?

2    A.   Yes.

3    Q.   And data like this?

4    A.   Yes.

5    Q.   Based on your experience doing that, can you describe for

6    the Court what is depicted here in Government Exhibit 5.

7    A.   Government Exhibit 5 shows incoming as well as outbound

8    text messages.  The first column indicates whether they were

9    income or outgoing, the second indicates the phone number to

10   and from which the text messages were sent.  The third column

11   indicates the time and date in UTC.  The --

12   Q.   Pause there for a minute.  Special Agent Ziegler, you

13   mentioned UTC.  Based on your experience in -- as a special

14   agent and doing these investigations and phone analyses, do you

15   have an understanding of what UTC is?

16   A.   I do.

17   Q.   Is it a time code?

18   A.   It is.

19   Q.   Does it bear any relation to eastern time?

20   A.   It does not.

21   Q.   Okay.  Can UTC be translated into East Coast time?

22   A.   Yes.  UTC is a standardized time code that a lot of cell

23   phone companies use.

24   Q.   What is its relation -- how do you translate from UTC into

25   East Coast time?

1    A.   It's approximately four hours ahead.

2    Q.   Which is four hours ahead?

3    A.   The UTC is four hours ahead of Eastern time.

4    Q.   So, for example, if a text message is received at

5    9:58 p.m., UTC, what would that be New York time?

6    A.   Approximately 5:58.

7    Q.   Okay.  So you were describing the columns, and I think you

8    got through columns one, two and three.  Can you describe for

9    the Court if you have an understanding of what columns four,

10   five and six reflect.

11   A.   Four I believe is coding that the network, the actual

12   provider, uses.  I'm not exactly sure about that one.

13          The fifth column indicates whether the text messages

14   was read or unread.  And the last column indicates the actual

15   content of the text message.

16          THE COURT:  And the second column, there's something

17   in red, CILLZ star.  What does that mean?

18          THE WITNESS:  I do not know exactly what that is.

19   Q.   With respect to the second column, just to be clear, in

20   each of these rows in Government Exhibit 5, there's a string of

21   numbers in the second column.  Do you have any understanding of

22   what those numbers are?

23   A.   Mm-mm.  It's a cell phone number.

24   Q.   The cell phone number.  Is that the number that this

25   particular cell phone was corresponding with?

1    A.  Yes.

2           MR. COOPER:  Your Honor, I believe an adequate

3    foundation has been laid.  And the government offers Government

4    Exhibit 5.

5           MR. PAUL:  I still object, with regard to relevance to

6    the issue before the Court, your Honor.

7           THE COURT:  You object on relevance grounds?

8           MR. PAUL:  Yes.

9           THE COURT:  Well, if the time is four hours earlier,

10   why would you contend it's irrelevant?

11          MR. PAUL:  Because I think the issue of this hearing

12   is to determine what occurred when my client was stopped and

13   ultimately frisked and items were recovered.  That's why.

14          THE COURT:  Well, I'm not sure how much weight I'm

15   going to give it, but I will receive it.  It may turn out it's

16   not entitled much weight, but I'll determine that later.  For

17   present purposes I will receive Government Exhibit 5.

18          (Government's Exhibit 5 received in evidence)

19          MR. PAUL:  Thank you, your Honor.

20          MR. COOPER:  No further questions.

21          THE COURT:  Do you want to do any cross?

22          MR. PAUL:  No, Judge.

23          THE COURT:  You can step down, Agent.

24          (Witness excused)

25          THE COURT:  Does the government have any other

1    evidence?

2                MS. CASTELLANO:  No, your Honor.

3                THE COURT:  Mr. Paul, are you going to offer any

4    evidence?

5                MR. PAUL:  Your Honor, I was intending to call my

6    client.  I realize it's late in the day.  I don't know if you

7    want to continue right now or --

8                THE COURT:  How long do you think you'll be with your

9    client?

10               MR. PAUL:  Well, we're going to march him through the

11   video and what occurred before and after.  So it may take some

12   time.

13               THE COURT:  All right.  I want to finish this as

14   quickly as I can.  Unfortunately, I can't do it tomorrow.

15               What's our schedule like on Monday?

16               MR. PAUL:  I'm free Monday, Judge, any time.

17               THE COURT:  How about the government?  Is the

18   government free Monday morning?

19               MS. CASTELLANO:  Monday is fine with the government,

20   your Honor.

21               THE COURT:  All right.  So we will resume 9:30 Monday

22   morning.

23               Is there anything anyone wants to raise before we

24   break for the evening?

25               MR. PAUL:  Not at this time, your Honor.

1          MS. CASTELLANO:  No, Judge.

2          THE COURT:  Thank you.

3          (Adjourned to April 18, 2016, at 9:30 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                              Page

BRANDON GEMBECKI

Direct By Ms. Castellano . . . . . . . . . . . . 2

Cross By Mr. Paul  . . . . . . . . . . . . . .20

Redirect By Ms. Castellano . . . . . . . . . .49

SEAN KINANE

Direct By Ms. Castellano . . . . . . . . . . .51

Cross By Mr. Paul  . . . . . . . . . . . . . .68

Redirect By Ms. Castellano . . . . . . . . . 100

KELLY ZIEGLER

Direct By Mr. Cooper . . . . . . . . . . . . 106

GOVERNMENT EXHIBITS

Exhibit No.                              Received

1   . . . . . . . . . . . . . . . . . . . . . 6

2   . . . . . . . . . . . . . . . . . . . . .10

3   . . . . . . . . . . . . . . . . . . . . .64

4   . . . . . . . . . . . . . . . . . . . . .65

5   . . . . . . . . . . . . . . . . . . . . 110

DEFENDANT EXHIBITS

Exhibit No.                              Received

A   . . . . . . . . . . . . . . . . . . . . .23

B   . . . . . . . . . . . . . . . . . . . . .28

C   . . . . . . . . . . . . . . . . . . . . .29