UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 15 CR 233 (PGG)

JAMES MCDOW,

Defendant.

------------------------------x

New York, N.Y.
April 18, 2016
9:45 a.m.

Before:

HON. PAUL G. GARDEPHE,

District Judge

APPEARANCES

PREET BHARARA
United States Attorney for the
Southern District of New York
RICHARD COOPER
GINA CASTELLANO
Assistant United States Attorney

KENNETH PAUL
Attorney for Defendant

(Case called)

MS. CASTELLANO: Good morning, your Honor. Gina Castellano and Richard Cooper for the government, joined by Brandon DeShields, a paralegal from our office, and Kelly Ziegler, HSI special agent.

MR. COOPER: Good morning.

MR. PAUL: Good morning, your Honor. Kenneth Paul for James McDow, who is present.

THE COURT: Good morning.

If I recall correctly, we had ended with the government's case and we were about to start with the defendant. Is that correct, Mr. Paul?

MR. PAUL: That's correct, your Honor.

THE COURT: Please proceed.

MR. PAUL: Your Honor, after several discussions over the weekend with my client, we rest and we would rely on the evidence as presented at this hearing for your Honor's ruling.

THE COURT: What is the parties' wish with respect to do you want to do any more briefing or do you want me to decide on the basis of the briefing prior to the hearing? What do you wish?

MR. COOPER: Your Honor, from our perspective, the legal issues have been presented to the court. The pretrial briefing and with the testimony from last week, we feel that there is an adequate basis. We are happy to argue it orally

today. We are not proposing to submit additional briefing unless the court requests it.

THE COURT: What is your wish?

MR. PAUL: I am prepared to go forward and argue today, your Honor.

THE COURT: It is your motion, Mr. Paul. I'll hear from you.

MR. PAUL: Thank you, Judge.

Let me begin by indicating to the court that it is my belief that some of this testimony, if not much of the testimony, was geared subsequent to a video being presented to these officers. I think some of it at least was --

THE COURT: What exactly do you mean by that? You say it was geared subsequent to a video being presented. What do you mean by that exactly?

MR. PAUL: Well, as I understand it, when Mr. McDow was arrested and the police presented these charges to the district attorney, he was charged with only criminal possession of controlled substance and charges related to that offense. He was not charged with a criminal sale. There was absolutely no mention at any time of going inside a building, there was no mention of a search that took place on the street going into the defendant's pockets.

I think that the video presented quite clearly, and I noticed that your Honor certainly was viewing that video

carefully, as we all have, and it certainly indicated something contrary to what was initially charged against Mr. McDow and what was relayed to the district attorney's office for this county.

In addition to that, Judge, let me just go on to talk about the fact that what occurred, as I understand the testimony of the officers, after what they claim was an observation of an individual exchanging with Mr. McDow, an item --

THE COURT: Let me stop you there. Is that what they claim? Because you and I had an exchange in your cross-examination of one of the police officers, and you were going down the road of saying to the officer about his testimony, about an exchange. I broke in and I said I don't remember hearing that.

Have you reviewed the transcript?

MR. PAUL: I haven't. Unfortunately, I haven't had access to the transcript.

THE COURT: I haven't either.

MR. PAUL: I did have access to my notes obviously.

THE COURT: But I do recall breaking into your question at the time and saying, I don't remember hearing about a hand to hand exchange. I don't remember that. The transcript will control and obviously I'll go back and read it.

I am not entirely clear, as I sit here, that there was

testimony from the officer that looking down from the rooftop he saw a hand to hand exchange currency for an object. I don't know that the record actually says that.

MR. PAUL: Without review of the record, I can't speak to that specifically, Judge. I do remember cross-examining Officer Kinane about his testimony to the grand jury where he said --

THE COURT: That's different.

MR. PAUL: Right. He talked about in that case that he observed, while driving down the street, an exchange that occurred with the defendant. And then he said, when I questioned him about that, he misspoke.

THE COURT: Right.

MR. PAUL: I don't know what misspoke means these days, Judge, but to me misspeak usually means when you say a word different than what you meant to say and not an actual occurrence of what you saw.

But be that as it may, that was my recollection of the testimony of Officer Kinane dealing with what occurred as they were driving down the street and ultimately, what I would submit to the court, arrested the defendant on the street. It is clear --

THE COURT: Why do you believe there was an arrest on the street?

MR. PAUL: Because both officers have testified that

when they approached Mr. McDow, one stood in front, one stood in back, just as the video is clear, and that the defendant was not free to leave.

THE COURT: Don't I have to look at what Mr. McDow would have perceived --

MR. PAUL: Yes.

THE COURT: -- in the circumstances?

MR. PAUL: Absolutely.

THE COURT: I hear what you're saying about what the police officers testified, but I have to consider whether Mr. McDow believed he was in custody, whether a reasonable person --

MR. PAUL: Absolutely.

THE COURT: -- whether they were in custody.

What do you have to say on that subject?

MR. PAUL: I think any reasonable person who is approached by the police -- and it is clear from the video -- first the police tell everybody to leave the area. They all leave. McDow was called back. Officer Gembecki stands in front, Officer Kinane stands in back. Any reasonable person, at that very point, would have believed he was under arrest. He could not leave, he could not back up, he could not turn his back and walk away. It was clear.

Even the officers said, no, he wasn't free to leave. So if their aspect of what was taking place is clear to them, I

think it certainly would be clear to a reasonable person, such as Mr. McDow, placed in that circumstance.

So it is my position that he was arrested the moment the police officers got out of the car, approached him, one in front, one in back. And according to Gembecki, as they're approaching, they not only, I would submit, are intent on arresting them, but they then inquire, do you have anything illegal, or you words to that effect. At which point there is no testimony in that regard that my client responded other than just standing there.

At which point we see from the video, even though Officer Gembecki tried to backtrack in terms of the actual search, whether or not there was actually a search going on. There clearly was. He was looking in all of the pockets of Mr. McDow, the back, the front, the side.

Subsequent to that, then there is a conversation that goes on for a minute or two on the street, at which point McDow is removing keys and opening the door to the building where they were standing in front of, and all three individuals entered the building.

Now, I would submit, your Honor, that at the time the police officers approached the defendant and stood in front and stood in back, he was under arrest and they should have -- if he was in fact under arrest, as I would submit -- not gone any further, other than saying we are arresting you. You should

not say anything, give his Miranda rights, and he should be warned.

He was never at any time given his Miranda rights, whether it was at that time or any time thereafter. So his response at some point, whether that is inside of the building or not, there seems to be contradictory testimony as to when he said, I have a couple of "bs" and "krills" on me. At that point, he had not been given any warnings whatsoever at any time.

So it is my position, Judge -- and I would thankfully say that Mr. McDow had the presence of mind to subsequent to this arrest, to video -- to record the surveillance of what was taking place on the street because I think --

THE COURT: I'm sorry. Who had the --

MR. PAUL: -- the presence of mind.

That came off of Mr. McDow's phone, Judge. That was where this video was recovered. That is a phone for which Mr. McDow used to record from the surveillance tape of the building, from the building.

If your Honor wants an offer of proof, I can certainly provide it, but basically what he did was, he went to the superintendent who he worked for, he went down to the basement, he asked do you have a recording, can we pull up the recording of what occurred on this date at approximately this time, and that's exactly what he did.

He recorded on his phone that recording from the surveillance tape of the building that the super was able to provide to him. That's how we got this video.

We got the video way before the government, and in fact the government only learned of this video when they evaluated what was on that phone.

THE COURT: Does the government agree with that account of how the video was made?

MS. CASTELLANO: Your Honor, we agree that it was on the defendant's phone, but as to how it was recorded, we can't say.

MR. PAUL: I think there was testimony that it appeared to be a recording taken by somebody with a phone looking at the video and recording that video, because there was movement and so forth. I think the government would certainly concede that it is Mr. McDow's phone where this video was ultimately recovered.

Now, what I would suggest, your Honor, is that what I submit happened on this street was either an illegal stop and frisk, or even more apparent from the video, an illegal stop and search, because that's exactly what occurred. As I indicated, both officers testified that the defendant was not free to leave. He was, I would submit, under arrest at that very point that they were surrounding him, one behind, one in front.

Now, as I suggested, as the police officers viewed this video subsequent to their arrest of Mr. McDow and being presented by the government, by the U.S. Attorney's office, to show them this video, all of a sudden there is what occurred for five or six minutes inside of a building. We don't know what took place in that building other than from these officers.

Obviously if Mr. McDow was testifying, he would testify as to what occurred, but I submit to the court that it is really unnecessary and unimportant to your Honor's ruling as to what, if anything, occurred inside that building because I think the crucial part of this suppression hearing is what occurred leading up to the arrest out in front of that building on Decatur Avenue.

I believe Gembecki, Officer Gembecki, said that whatever statement Mr. McDow said, specifically I have a couple of "bs" and a "krill," he believed happened inside of the building. If that is the case, they had absolutely no basis, I would submit, search, frisk or do anything to Mr. McDow on the street, certainly not looking into his pockets and so forth.

I would also suggest to the court, when I asked the officers, why did you go inside the building, their answer was because Mr. McDow wanted to. And once he got in the building, or whether it was outside or inside, the reason was he wanted to turn over his money that he had on him. Well, this would

probably be the first arrest that I have ever witnessed where police officers even entertained what a defendant was requesting to do.

I find that hard to imagine that Mr. McDow, turning to the officers, said can we take this inside. I really would like to go inside the building and the police officers, after searching his pockets and so forth, decided to go by what the defendant was requesting. I find that really quite incredible.

THE COURT: What's your theory about why they went into the building? My theory is that, quite frankly, why they went into the building is that when they searched the defendant out on the street and found nothing, they weren't satisfied. They went inside of the building to do a more thorough search.

That is my theory of what occurred, whether that was a body search or full search or whatever, Mr. McDow is not testifying to that, but I would submit to the court, there was a followup search that occurred inside that building and that was the reason they went inside. It had nothing to do with the defendant saying, can we go inside and talk about that inside? I don't think that happened, Judge.

What I am saying to the court, as difficult as it may be, is I do find that some of the credibility of the police officers is lacking here, but I would argue to this court that, quite frankly, your Honor doesn't have to make any decision as to their credibility, because I think even if your Honor was to

accept what they had to tell the court in their testimony, as I believe, was an equivalent to a stop and frisk and there this case it really was a stop and search.

When they went inside of the building, this illegal search simply continued. Now, if your Honor believes that this was, in fact, a legal stop and a legal search, based on what the police were thinking at the time there perhaps had been an exchange, which I question, he was never charged, as I indicated, because I would submit that never happened.

How easy is it for the police to go to the district attorney's office and say we pulled up on the defendant, and lo and behold, on his waistband we recovered 153, or whatever it was, glassines. The criminal complaint, as your Honor saw and was testified to by Kinane, does not contain any charges of criminal sale and he was not indicted for any charges of criminal sale.

In fact, the criminal complaint says he observed, meaning Officer Kinane, defendant to have on his person in his pants waistband area 153 glassine envelopes. That's very eyes, if there had not been a video search there was a thorough search and they went inside the building, that would be what we are left with. The police officers simply saying they pulled up on the defendant and they saw in his possession of 153 glassines.

In answering your Honor's question as to whether or

not there was an illegal arrest here, to begin with, I would suggest that your Honor review -- and I would certainly cite the government's response to my motions, which was to suppress statements and/or the seizure of evidence that they intended to utilize in this case.

The government's own answer was the government expects that the evidence at the hearing will show that, at the time the defendant stated, in sum and substance, that he had a couple of "krills" and a couple of "bs" on his person, he was not yet in custody. I question that conclusion.

Then it goes on to say how the first step requires consideration of whether a reasonable person in the defendant's position would have understood that he or she was free to leave. I would submit any reasonable person would have concluded they were not free to leave, as the police officers testified. Among the fact that is relevant to the determination of whether the suspect is told that he is free to leave, well, that didn't happen.

The location and atmosphere of the interrogation on the streets with an officer in front and an officer behind, the language and tone used by the law enforcement officers. In this case, searching through his pockets, whether the suspect is searched or frisked, which he was, and the length of the interrogation. Your Honor can conclude by looking at the video how long that interrogation, if any, took place.

The second step in the quote-unquote ultimate inquiry looks to whether there was a restraint, a freedom of movement akin to that associated with a formal arrest. I would submit, yes. The custody analysis begins by asking whether a reasonable person would have thought he was free to leave the police encounter at issue.

On the other hand, if a reasonable person would not have thought himself free to leave, additional analysis required is because not every seizure constitutes custody for purpose of Miranda. The count asks whether in addition to not feeling free to leave, a reasonable person would have understood his freedom to have been curtailed to agree associated with a formal arrest. Only if a reasonable person would have answered yes -- and I would submit that would be the answer here -- to this second question, was the person in custody for practical purposes and entitled to the full panoply of protections prescribed by Miranda. I couldn't have said it better myself.

With that, your Honor, I would submit that your Honor has sufficient evidence before you to suppress the items of both the phones and the narcotics that was claimed to have been recovered from Mr. McDow.

Thank you, your Honor.

THE COURT: All right. I'll hear from the government.

MR. COOPER: Your Honor, I would like to do three

things. The first is to respond to a few particular issues that Mr. Paul raised, second, talk about some of the facts elicited at the hearing, and third, the legal framework.

I won't belabor the law, your Honor, based on briefing that has a picture of what our position is.

THE COURT: Let me ask you because I want to make sure I understand. When I read your brief before the hearing, I came away with the impression that you were arguing there was probable cause to arrest Mr. McDow before any interaction took place between the police officers and him. Is that your position?

MR. COOPER: Yes, your Honor.

THE COURT: In other words, you believe that based on the rooftop observation, there was probable cause to arrest Mr. McDow, that's your position?

MR. COOPER: The short answer is yes. There are other bases.

THE COURT: I want to start with that.

MR. COOPER: Sure.

THE COURT: Because, again, that was my understanding of the government's position.

I want you to tell me what evidence I heard that would permit me to make a finding that there was probable cause to arrest Mr. McDow based on Officer Kinane's observations from the rooftop.

MR. COOPER: Certainly, your Honor.

The transcript cites Officer Gembecki, page eight of the transcript, and for Officer Kinane, pages 56 and 57 of the transcript, along with Government Exhibit 5.

THE COURT: Do you have the transcript? Do we have a copy of the transcript?

MS. CASTELLANO: We do, your Honor.

MR. COOPER: Yes, we do, your Honor.

MR. PAUL: 56 and what?

MR. COOPER: 56 and 57.

Your Honor, the first cite is Officer Gembecki at page eight, where Gembecki is asked:

Question: And what, if anything, else did Officer Kinane say on the roof?

THE COURT: What line are you at?

MR. COOPER: Line three is the answer.

He said: Other descriptions of individuals that met with that male -- that male, Officer Gembecki had previously testified, was the defendant -- for a short time, brief time, and left shortly thereafter.

Question: Do you recall how many meetings you described?

Answer: I would say approximately two.

So there is general testimony about what Officer Kinane said he observed from the roof, and then the more

specifics are on pages 56 and 57. This is about a page and a half. I won't read the whole thing into the record, but it starts with the answer at the top of 56.

The carryover question is: Officer Kinane, while you were on the roof, what, if anything, did you observe the defendant do?

I can pause so that your Honor can look at that.

THE COURT: If you would.

All right. Go ahead.

MR. COOPER: Your Honor, the uncontroverted testimony, we have no testimony from the defendant or any evidence put in by the defense that the observations from the rooftop were that the defendant engaged in meetings on the street that appeared to officers trained in narcotics investigations who had made numerous narcotics arrests prior to this point in time to be hand-to-hand transactions.

This is corroborated, your Honor, by Government Exhibit 5. We are not relying on these text messages, but there is the evidence in the record that is recovered from defendant's cell phone, at times approximating the times that Officer Kinane said he observed these hand-to-hands from the roof, texts to and from the defendant's cell phone about somebody wanting to please buy two or three packs, which is independent corroboration, your Honor, about what Officer Kinane testified he observed from the roof.

THE COURT: As you said and as you know, I can't rely on that to find probable cause because police officers didn't know what the text messages are about.

Just to cut to the chase here, there is no question Mr. McDow is selling drugs. That is obvious. What is less obvious is whether the police had probable cause before they restrained him to believe he was selling drugs. But no reasonable person could look at the evidence here and conclude anything other than Mr. McDow was selling drugs. That's what he was doing. But that's not the issue for purposes of this hearing. I am focused on what did they know at the time and when did an arrest take place.

Go ahead.

MR. COOPER: Two responses to that, your Honor.

The first, I would point your Honor to Morales v. Greiner, which is at 381 F.3d 47. It is a 2004 Second Circuit case where the fact pattern is similar to the fact pattern here.

In that case, the officers were at a drug prone location. There was testimony here from both officers that this block was a drug prone location. One of the officers testified that he did vertical patrols of stairways in buildings for glassines, needles, and other drug paraphernalia. There had been testimony from at least one of the officers about drug-related arrests on the block and car stops leading

to drugs, seizure of drugs, from cars coming off of that block. So we have a drug prone location, number one.

Number two, we have uncontroverted testimony from two officers about observation of what appeared to be hand-to-hands. I believe that when your Honor takes a look at the Morales case that I cited, the court will see that the facts there are remarkably similar to these facts. The Second Circuit there held that there was probable cause at that point. So that is argument number one.

THE COURT: I am not familiar with the Morales case. Let me ask you this. The officer in that case, I take it, was one of these rooftop observation cases?

MR. COOPER: I don't recall whether it was rooftop or street-level observation, your Honor.

THE COURT: My question is, wherever the officer was, do you recall whether he saw the exchange of currency?

MR. COOPER: I don't recall whether there was that particular observation.

THE COURT: Go ahead.

MR. COOPER: So, obviously our argument, number one, is at the time the officers went down to the street, they had probable cause to make an arrest. But based on the facts that were elucidated at the hearing, your Honor, including the defendant's affidavit, we believe that, number one, when the police first approached Mr. McDow, it was a voluntary

encounter. I can go through some of the factual aid to that.

Second, your Honor --

THE COURT: What does that mean, it was a voluntary encounter?

MR. COOPER: That they did not restrain Mr. McDow's movements. They didn't tell him he had to stop. They certainly exerted no physical force on him. It was a consensual encounter requiring the lowest --

THE COURT: That's another way of saying he was not in custody when they approached him and spoke with him?

MR. COOPER: Correct.

THE COURT: Now, what is your position on whether they went through his pockets or asked him to produce what was in his pockets?

MR. COOPER: The testimony and the video, your Honor, we believe, are consistent that it doesn't look like the police went into his pockets. I know Mr. Paul questioned at least one of the officers at length, but the officer, based on his recollection and also based on viewing the video, didn't recall the officers going into the pockets.

On the video, it is frankly difficult to tell whether someone puts his hands in Mr. McDow's pocket, whether Mr. McDow himself goes into his pocket or there is no entry into a pocket. You sort of see Mr. McDow holding up his shirt and he is wearing a very long shirt and sort of large pants, so it is

difficult to tell.

But even in the situation where is a Terry stop or a consensual encounter, the officers can ask Mr. McDow if he has anything on him that may hurt them, and they can, while they're conducting this limited discussion with Mr. McDow, do a patdown of his pockets. In fact, the evidence at the hearing indicates that the search was not as complete or intrusive as Mr. Paul makes it seem.

THE COURT: Does it look like he is producing something from his pockets?

MR. COOPER: From my vantage point, it is hard to tell. He may be. But what was clear is that he is lifting up his shirt and there are hand motions around the pocket area.

But with a patdown, your Honor, that is what the officers would do, they would feel the outside of the pockets. But it is difficult to tell. There is no testimony from Mr. McDow at the hearing that this is what the officers did. He didn't take the stand and say, they went into my pockets, they reached into my waistband.

The evidence is that it wasn't until the officers got into the car that Mr. McDow produced an additional, I think it was, 15 bundles of heroin. That's indicative that the initial patdown, and whatever other patdowns there were prior to putting Mr. McDow in the car, were not that intrusive, because the officers didn't get that additional drugs.

THE COURT: What are your thoughts as to why he wasn't charged with criminal sale?

MR. COOPER: How and why the Bronx District Attorney's office makes the charging decisions it does, it is difficult to tell. I don't know why, standing here today, they chose to charge this as a possession and not a sale. It could have been because the buyers with the drugs were not arrested.

Your Honor will see in the case law a number of cases where there are apprehended buyers that the police recovered drugs from, then they arrest the seller. That does not appear to have happened here. That may be the reason, but that is a speculation here.

But the fact that the Bronx chose to charge this in the way it did, it is not necessarily relevant to the inquiry of whether the officers were truthful on the stand about what they saw and whether the actual facts of the encounter on the street with Mr. McDow were custodial or not.

THE COURT: You say that this was a voluntary encounter or a consensual encounter. The police, when asked at the hearing whether Mr. McDow was free to go, said no. At least in their mind, it wasn't a consensual voluntary encounter. You would agree with that?

MR. COOPER: Yes, which is not uncommon at all for the police to approach a suspect with probable cause, with a basis to arrest, but for strategic reasons choose not to effect an

arrest at that moment but to engage the individual in conversation to continue the investigation.

THE COURT: What do you say about the physical placement of the officers? What I am thinking about is, I recall Officer Gembecki questioning Mr. McDow face to face, but then I have a distinct memory of Officer Kinane positioning himself directly in back of Mr. McDow as if to frankly cut off any escape. What do you say to that?

MR. COOPER: A few things. Yes, that is the officer's testimony and the video evidence about what the initial encounter was on the street and also in the lobby. So that was their position.

Nonetheless, a few things. One, there is no indication that Mr. McDow turned around and tried to get away, was even aware of Officer Kinane behind him. Mr. McDow didn't say that on the stand.

Two, given the location of where this happened, first out on a public street, people walking by, your Honor will recall in the video I think twice during the street encounter there were people who walked right by and went into the very building that Mr. McDow then went into. So it is a public street, people walking by, it is a public lobby where there is evidence in the record that two people went into prior to Mr. McDow going in.

The location of this encounter sort of countervails

the fact that there was one officer in front and one officer in back, along with the fact that the defendant. There is no investigation in the record that the placement of the officers made him believe he wasn't free to leave. In fact, there are cases, your Honor, where search warrants are executed and a target is sitting on a couch surrounded by law enforcement agents. There is questioning, and even there, on those facts and circumstances, that is not held to be custodial necessarily or per se.

The circumstances here are far less restrictive of movement. Really, the inquiry in part is based on what Mr. McDow's truthful subjective understanding was, and there is no evidence in the record, except his affidavit, your Honor -- again, the court can give this affidavit whatever weight the court wishes, given that Mr. McDow didn't take the stand and subject himself to cross-examination -- but he claims in his affidavit, we believe, untruthfully and somewhat fancifully, when he went into the building -- this is a two-page affidavit, docket 78 in the record -- his affidavit is that he goes into the building --

THE COURT: Give me a second, I am trying to find that.

MR. COOPER: Sure. Do you need another copy? We have a copy we can hand up to your Honor.

THE COURT: Thank you. Go ahead.

MR. COOPER: Again, we think your Honor should afford this affidavit little to no weight, but it is telling what Mr. McDow says happened. He is narrating in the first few paragraphs beginning of what happened. He says at the bottom of paragraph six that it is the officers who asked him if he had a key to the building, and then he opened the front door. He says he was searched thoroughly inside the building.

He then says -- this is paragraph six carrying over from page one to page two -- that he and the two officers go upstairs to the fourth floor of a walkup, open up an apartment door, and then rather than enter the apartment, go back down to the lobby, which on its face is a factual contention that is not deserving of much credit.

But then he says in paragraph seven that they get back down to the lobby, and he is strip searched in a public lobby. Other than this statement in the affidavit, there is absolutely no evidence in the record that that happened. The whole encounter in the lobby, the uncontroverted evidence is it lasted five minutes.

Mr. McDow says that in those five minutes there was an additional search in the lobby or at least a patdown, there was a discussion, there was a walk up three flights of stairs, two officers with the defendant who appears to be much larger than they are, entry into an apartment, exit from an apartment, walking back down three flights of stairs, and a strip search

in the lobby.

The video that your Honor has shows the defendant coming out of the lobby. He does not appear to be perturbed or disturbed in the way one would expect them be if they were just strip searched.

But on this point, on the custodial point, the defendant says in paragraph eight, thereafter -- meaning after all of what he said happened -- I was placed under arrest. There is no statement before that where he says he wasn't free to leave, where he says he felt like he was in custody. The only statement he makes in his own self-serving affidavit is this first sentence in paragraph eight.

Your Honor can certainly take notice of that statement as some indication of the defendant's subjective belief about whether he was free to leave or not.

Shall I continue?

THE COURT: Well, what about the fact that, I guess, was it Officer Kinane who testified, I believe, in the grand jury that he saw McDow do a hand-to-hand as they were pulling up in the car? Is that what he testified to in the grand jury?

MR. COOPER: Yes, your Honor.

THE COURT: Which was wildly wrong, right? He just was mixed up?

MR. COOPER: Yes. I think the testimony at the hearing there was, in reviewing those minutes, he was

incorrect. He was wrong when he said that.

THE COURT: Shouldn't that give me significant pause in terms of evaluating his credibility about what happened on this particular day?

MR. COOPER: It is certainly a factor that the court should consider. We feel that there is no basis for any kind of credibility filing about Officer Kinane in terms of how he testified on the stand. I think, your Honor, what we will see when you take a look at the transcript, that Officer Kinane's recollection on the stand this past Thursday was more distant. It has been about two years since this incident, maybe a bit more. His recollection on many of the facts was much crisper closer to the time of the interaction.

THE COURT: But, no.

MR. COOPER: He said that from the stand.

THE COURT: My point was that he was completely wrong in the grand jury, which was much closer in time. That's my point.

I mean, this isn't the typical case where memory has faded over time, and so it is understandable that someone's testimony in court many months later, a year and a half later, it is understandable that their memory would dim over time and details might get garbled.

But what happened here is that there was testimony in the state grand jury much closer in time to the incident and it

was flatly wrong.  That's the problem.  And that's what is troubling is, it is not the typical case where a memory has faded over time.

It seems to me that the officer, Officer Kinane, didn't have a good memory of what happened at the time he testified in the state grand jury, which was a very long time ago, and I suspect what happened is his memory was refreshed, to a certain extent, by the happenstance of the video.

I suspect that when he saw the video, that's when his recollection changed.  What do you say?

MR. COOPER:  Your Honor, a couple things.  First, the video only begins when the officers park the patrol car and get out and start talking to him.  I don't know one way or the other whether there was video from before that when the officers were on the rooftop observing the exchanges.  Mr. Paul made an offer of proof to your Honor that it was the defendant who went into the superintendent's office and took a tape recording of this encounter from a video screen.

We don't know one way or the other whether that is correct.  We do know that it was recovered, the video in evidence was recovered from the defendant's phone.  It is quite possible that happened.  If that is true, if what the defendant is telling Mr. Paul is true, then the defendant himself chose to begin the video when the officers parked their car and not prior to that.  I think that also is telling.

That's our response to the last part of your Honor's question. On the first part about the grand jury testimony, yes, Officer Kinane was wrong when he testified in the grand jury that in addition to the observations from the rooftop, he also saw a hand-to-hand as they were pulling up in the car.

I don't know that the video one way or the other would have refreshed his recollection or changed his recollection about that, because the video starts after that. In fact, I think I can be a bit stronger about that point. It is quite clear that the video would not have either changed or refreshed his recollection because the video begins after that point.

THE COURT: Well, the video begins -- it is a little hard to tell, as I recall -- but the video appears to begin with the police car pulling up and the officers getting out and approaching him. It is probably a matter of seconds, but I don't recall seeing anything on the video that looked like a hand-to-hand transaction taking place immediately before the cops approached him.

It is just seconds, and I suppose something could have happened in the seconds before the video began, but there is a brief point in time where the police car is pulling up and Mr. McDow was with some other individuals. I don't recall seeing anything that looked like an exchange at that particular moment.

MR. COOPER: I think that is right, your Honor. I

don't recall seeing a hand-to-hand exchange in the video before the officers get out of their car either. My point is merely that there is no, to your Honor's question about whether Officer Kinane testified one way in the grand jury and, upon seeing a video, more recently changed his recollection changed, I don't think there is anything in the video that necessarily would have done that. It is not like saying something happened and then seeing the video at that point in time that the thing did not happen.

THE COURT: Well, then that just raises more questions, because then why did he so dramatically change his testimony if it wasn't the video? Because he went from, I saw this man. Again, this is testimony. This isn't even a report. This is testimony in the grand jury that he witnessed an exchange, a drug exchange. This is serious. To go from that to it was just a mistake, I misspoke. That's a problem.

MR. COOPER: Your Honor, it is clear that that is what the facts are. The point I would make on that is that this is not a case where Officer Kinane's testimony here in the context of the suppression hearing is more inculpatory of the defendant. To the extent the court is concerned about Officer Kinane's credibility here on the stand in front of the court on Thursday, it is not a case where he said, yes, your Honor, I saw currency. I saw baggies being exchanged. It would have been one thing had he testified in the state grand jury that he

didn't see this or he saw nothing as he pulled up, and then coming here before your Honor, he testified that he did.

I would suggest to the court that that would be a circumstance that should give the court pause about the officer on the stand in front of your Honor. This is the opposite of that as to why he had that recollection or gave that testimony then. But upon further reflection and careful preparation and thought back to the incident, he no longer has that recollection. I can't say why, but it is the opposite of what the court would expect if there were somebody on the stand in front of the court that was not being truthful here before your Honor.

Officer Kinane, in some respects, his memory faded. I would sort of counterpose the two officers. It seems from their testimony that Officer Gembecki had a pretty crisp continuing recollection of what happened, a recollection that has been unchanged over time. Officer Kinane on a number of areas was just a bit less clear. I don't think the court heard him contradict Officer Kinane. His memory was just a bit less clear.

On that basis, the court could do what courts often do, where there are two officers and one has a clear recollection and another's recollection is a bit fuzzier. It is clear that the one whose recollection is clearer was more focused on the events, which makes sense in the context of this

case where it is Officer Gembecki. From the video, the court can see the one engaging on the street with Mr. McDow. It makes sense that that is the officer who is going to have the clear recollection of what was said where in the context of the encounter. He was the one doing the talking.

THE COURT: Go ahead.

MR. COOPER: A couple other points, your Honor.

Defense counsel keeps on coming back to this referring that any reasonable person would believe that he was under arrest at the point where there was this encounter in the street. For the very same reasons that defense counsel points out the multi-factoral test, the court is aware, the factors weigh in favor of this being a noncustodial setting. That is relevant for both the motion to suppress the evidence and to suppress the initial statement about the "bs" and the "krills."

First, the defendant was not told anything either way about whether he was free to leave. Second, the location out on a public street, out in a public lobby, with people walking by on the street and people walking into the lobby. Third, there is no testimony from the defendant about the officers taking an aggressive tone, and your Honor can see from the video of at least the conversation on the street. It does appear to be very much a conversation. Officer Gembecki is not flailing his arms. He doesn't appear to be getting agitated or angry with the defendant. It appears to be a conversation.

Whether the defendant was searched, again, there is a question. It is not clear from the video about whether pockets are gone into. The officers have their testimony about them not going into the pockets and that doesn't appear to be wrong based on the video. But they would have been entitled, for officer safety, to do a patdown during this encounter.

In terms of the length of the interrogation, this is relevant to the statements, your Honor. This is not the case where the defendant sat down and he is interviewed and he is questioned. The testimony is that there is a conversation on the street, not necessarily questioning, interrogation. Then they go into the lobby and there are a few more questions. This is not the case where there is a post-arrest interview or a pre-arrest interview where they are sitting down and asking Mr. McDow question after question. That is just not the testimony. There is no evidence to controvert that.

Based on the factors, there wasn't custody at the time the defendant said this thing about "bs" and "krills." From the perspective of whether or not the officers were appropriately going into Mr. McDow's pockets in the lobby or his waistband in recovering the first bundle of heroin, first, the officers don't really recall whether Mr. McDow produced it or they recovered it, but second, in any event, at that point in time, the uncontroverted testimony where Officer Gembecki had a clear recollection is that they are talking to Mr. McDow

again in the lobby.

The question is, do you have anything on you that you shouldn't have or something of that sort. The answer is, I have got a couple of "bs" and a couple of "krills." At that point, you have officer testimony about observation from the rooftop. You have Mr. McDow's statements to them that he has drugs on him. Certainly, at that point, they are authorized under the law to do a more complete search to recover those drugs, so that first encounter in the lobby.

By the way, on that, I think the way that the patdowns took place also makes complete sense in the context of what the officers said they were doing. The patdown on the street was for officer safety. It is related to a search for weapons. It makes sense that they wouldn't necessarily find one bundle in a waistband or 15 bundles somewhere inside the defendant's pants, if what they are feeling for are things like guns, knives, needles. Your Honor will recall that the officers only recovered the drugs later on in time, so that is the lobby.

If I can turn briefly to the statement in the car. Your Honor may recall, Kinane is in the back seat with the defendant. Gembecki is driving. They are going from the building back to the police precinct and the officers, both officers' testimony, is that Kinane is in the back seat just trying to explain to the defendant what the process is. I think one of the officers said it was to try to calm the

defendant down. The other officer may have testified it was just to explain what was going to happen. The explanation was -- I am looking for the cite here -- Gembecki's testimony, your Honor, is at page 18 of the transcript.

Question, do you recall what Officer Kinane said?

Answer, I recall Officer Kinane trying to calm Mr. McDow down. He was very upset. I remember my partner saying it is only a bundle, we will try to get you a DAT. I remember Mr. McDow saying, do you understand, I can't get a DAT, I have a lot more. That's when there was this testimony about Mr. McDow, who was double handcuffed, leaning forward, and sticking his hands into his pants or his waistband area and wriggling out additional drugs.

Officer Kinane's testimony is not contrary to that. That is at page 60 and 61 of the transcript.

Page 60: Question, do you recall what you said to the defendant?

Answer, in the car we, were just talking about possible desk appearance ticket, which means he would have been released that day for the amount, the one bundle that he had.

Then Kinane goes on to say on page 61, I'll give you a desk appearance ticket and you'll be released the same day, as long as we have a mutual respect. I'll give everyone that benefit of the doubt at that point. Then Kinane goes on to say he stated he was on parole and he wouldn't be eligible for a

DAT.

So the officers have a slight difference in what they recall Mr. McDow saying, but the point for the court's analysis is that they weren't questioning Mr. McDow in the back of the car. The uncontroverted testimony is that there was an explanation about what they expected to happen. He was going to get a ticket, he was going to get a cut that day. Then he said, no, I am essentially not going to get cut, I've got more, and that's what he had. He had more.

Just to sort of step back for a second, our argument is in a few parts. First, we believe the court can find that there was probable cause at the time the officers got down to the street to arrest Mr. McDow, but the court does not have to reach that question because there certainly was reasonable suspicion to approach him and to engage in a Terry stop, a limited stop and a limited question.

We also believe that it was a voluntary encounter. In other words, that the defendant's movements were not restrained in any way. But certainly on any of those three bases, there was a sufficient basis for the officers to approach Mr. McDow. That's number one.

Number two, the statements about the "bs" and the "krills" was made in the lobby. It was made in response to questioning, but it was not made in a custodial setting. I am not going to repeat all the factors in the arguments about

that. Number three, the statement about the defendant having more on him was made in custody. He was in handcuffs in the back of the police officer, but it was not made in response to an interrogation. It was the officers explaining to him what they expected to happen.

Last, I would point that the defendant submitted an affidavit which is different in material ways to the testimony of the officers. The defendant didn't testify. Under the case law, the court can accord whatever weight to the affidavit the court sees fit. But for the reasons I discussed earlier, based just on the face of the affidavit, the story that the defendant is telling is absurd, so the court should not accord any weight to the affidavit.

Unless the court has further questions, that is our argument.

THE COURT: Mr. Paul, anything else you want to say?

MR. PAUL: Just a few points I would like to respond to, your Honor. Maybe two people looking at the same thing may walk away with a different reaction. I don't know if your Honor, in preparing your Honor's decision, has access to the video. I know your Honor looked at it.

THE COURT: Yes. We have the video and we will be looking at it again, Mr. Paul.

MR. PAUL: Thank you.

When your Honor looks at that video, and I know your

Honor will carefully, I would only, again, emphasize what took

place on that street with the police officers looking not only

opening up the pockets, but looking inside the pockets, asking

the defendant questions about what is occurring.

The government keeps claiming that I think their term

was, this was a voluntary encounter, and it was limited in

terms of scope. I don't know what a voluntary encounter is. I

certainly know when a defendant is moving away, as instructed

by the police officers, which apparently was apparent from the

video, that he and the others standing in front of the location

were asked to move on, and then he is called back. That's a

stop. It is also a stop when Police Officer Kinane is standing

directly behind him.

Now, you don't have to have a camera in the back of

your head to know that that police officer standing behind him

in blue is close in proximity to Mr. McDow's body. In fact,

when you look at that video, they are searching not only his

front pockets, but he is asked to look in the back pocket as

well, while Police Officer Gembecki is looking in that pocket.

And as he turns, it is no question that Mr. McDow would

certainly be aware that Officer Kinane is standing directly

behind him.

He was in custody at that very moment. You would have

be to absolutely crazy not to understand that two cops, one in

front, one in back, and asking you first to stop and come back

to them, has stopped you and placed you in custody. Again, the government keeps talking about this as a patdown on the street. I don't think that this was a typical patdown looking to see if there was any hard object in the pocket of the defendant. They were looking inside those pockets. If whether it was the defendant reaching in or the police officer, it is clear from the video that this was a thorough search of the pockets of Mr. McDow.

The government talks about Mr. McDow's affidavit. I would point to paragraph five where it says, while standing on the sidewalk in front of 2559 Decatur Avenue, County of Bronx, I was stopped and questioned at approximately 6:18 p.m., when two police officers in uniform drove up in an unmarked car, and after they got out of the car and approached me, they told me to move away from that location. When I proceeded to do so, they called me back, asked if I had weapons in my possession, and after I told them I did not, they proceeded to search inside all of my pockets.

That is what occurred, that is what Mr. McDow has stated in his affidavit, and that is exactly what the video corroborates. It is also interesting to point out that the government tries to breeze over Officer Kinane's testimony in the grand jury when he, quote-unquote misspoke. I guess he must have misspoke when he never told the district attorney's office in the Bronx County or the grand jury that anything ever

happened inside of a building. No mention of a building. No mention of any encounter off the street.

Why is that? Because at that time, the officer did not know there was a video showing three individuals, including two officers and Mr. McDow, entering 2559 Decatur Avenue. Interestingly enough, no mention of that. No mention of the sale that he says that he observed in the grand jury. No charge of criminal sale of controlled substance. Why was that? There was no evidence to corroborate any evidence of such an exchange.

I would also submit, when the government talks about the defendant not appearing to be upset when he was being ushered out of a building, he is handcuffed. I couldn't see his face, but I don't know what would have shown that he was fully upset, having been stripped or searched inside of the building, other than him being handcuffed behind his back. I don't know what we could have observed to show that aggravation. Though he does admit, inside of the car, he is very angry and very upset. Admittedly, Mr. Cooper said that.

So I would submit that anything that flows and follows that encounter on the street should be suppressed. Whether that be the statement, what he has on him, according to the police officers, what is seized from his possession, the statement inside the patrol car, the phones that were seized, the drugs that were seized, that all should be suppressed. The

money that was seized apparently was returned to him, so apparently I don't know if that is evidence that the government is introducing, but that was, in fact, returned to Mr. McDow by the state authorities.

THE COURT: Does the government agree that the cash was returned?

MR. PAUL: I can hand up to the government the return. Sorry, Judge.

MR. COOPER: While we are waiting for Mr. Paul, your Honor, whether or not it was returned, the government would admit testimony about the money being recovered from the defendant.

THE COURT: I understand that. It seems odd that it was returned, but...

MR. PAUL: Judge, we don't have the actual receipt. We don't have it in our possession right now. Needless to say, I believe the money was, in fact, returned by an application that was made by Mr. McDow to have it returned. It was granted by the comptroller's office. There was an asset identification number of 14 DEA 603715. It was $2,331, but I'll present that to the government when I gain possession.

THE COURT: This was cash that was on him at the time of his arrest?

MR. PAUL: That's correct.

THE COURT: Go ahead, Mr. Cooper.

MR. COOPER: Just a few points, your Honor.

First, in terms of another fact that bears on the custodial determination, in Government Exhibit 2, which is the disk with the three surveillance videos, video three, there are three videos on that disk, from the beginning through the 30-second mark. This is while the defendant is still in the building. There are people coming in and out of the building lobby, which is another factor that the court should consider.

Just two other points in response to what Mr. Paul said. First, this argument about Officer Kinane not mentioning anything about the building when he is in the grand jury. The officers' testimony is that he answered the questions that were put to him by the assistant district attorney. It is not at all uncommon and, in fact, it would be quite rare for a law enforcement agent to narrate every event that happened during the course of an arrest for an investigation to the grand jury in the context of presenting testimony. So that should not be taken to indicate any untruthfulness or trying to shade things in front of the grand jury.

THE COURT: No, but you have to admit that given at least your position here, that the most important encounter was in the lobby. That's when that bundle of heroin was actually either produced by Mr. McDow or seized by one of the officers. It is odd that that account wasn't given in the grand jury.

I accept your point that a police officer can only

respond to the questions that they are asked in the grand jury. They are not there to give a spontaneous monologue about what happened. But what it does suggest, because that encounter in the building lobby was not testified to in the grand jury, and given its significance as you have presented it, what it suggests is that the ADA was not aware of the counter in the lobby.

That's the problem. It is not that the officer didn't spontaneously recount the sorry about what happened in the lobby in the grand jury, but that the ADA didn't appear to know about that encounter, which suggests that the officer did not tell the ADA about the encounter in the lobby. That's what flows, I think, from his grand jury testimony.

MR. COOPER: I certainly understand what the court is saying. We don't read it the same way. The flow of the grand jury testimony of the officer, the officer is describing in general terms what happened, that they encountered the defendant in that vicinity, they had a brief conversation with him. They recovered the drugs.

In terms of where the drugs were recovered and whether they then went into the building or not, from that perspective, from the perspective of an officer testifying in the state court grand jury, doesn't necessarily seem or is not necessarily that important and not necessarily deserving of the kind of description that the officer gave about the much larger

quantity, the 15 bundles under pretty unique circumstance that were recovered in the car. There was testimony about that.

And that makes sense, because it is a very unusual thing to happen. Number one, it is a lot more drugs. It is 15 times the amount of drugs. Number two, you have a defendant wriggling and sticking hands inside of his pants and getting 15 bundles and a couple bags of crack into his pants. It is an unusual thing, and I submit it is a sort of thing an officer to remember with more clarity than or testify to with more specificity than where they were when these statements happened.

Unless the court has further questions, we just wanted to make those few points in response.

THE COURT: All right. Anything else, Mr. Paul?

MR. PAUL: I'm sorry, Judge. Can I just have one second?

Judge, quickly in response to Mr. Cooper's answer to the court. I would suggest, quite frankly, your Honor, that the reason the police officers testified the way they did, eliminating any issue of the building, the reason that he was charged in a criminal complaint where it says simply the officer observed defendant to have on his person, in his pants, waistband area, 153 glassine envelopes, makes it very simple.

Everything occurred, we pulled up on him, we did a patdown, we observed and removed these drugs from his

waistband. And subsequent to that, or at that time, he admits to having a couple of "bs" and "krills." It is very simple, closed shut case. Take it to the grand jury, end of story, until they see the video of what actually occurred and your Honor sees the video of what actually occurred that calls into question not only the credibility of these police officers of what actually occurred on that date when Mr. McDow was arrested and items were subsequently seized from his person.

Thank you, Judge.

THE COURT: All right. Mr. Cooper, do you want to say something else?

MR. COOPER: Very briefly, your Honor.

Based on the documents that the court has in front of you, these aren't in evidence, but there is 3500 for the officers from Ms. Castellano's first meeting from the officers or first call with the officers back in December. This was before the officer's testimony that they saw the video and before the 3500 indicates that they saw the video.

In Officer Kinane's 3500, which is 3502-09, these are notes from a December 10, 2015 meeting with Officer Kinane and representatives from the government. Officer Kinane talks about going into the building lobby. This is before he saw the tape.

The point is just that the suggestion that the officers shaded their testimony or changed their entire

recollection based on seeing the video was just not brought out by the facts here, and an unfortunate statement to make about two officers trying their best for the government and before the court to testify as to the best of their recollection.

MR. PAUL: The government has pointed out 3500 specifically. I would also address the date of that in December was after the defendant submitted their motion with the attached affidavit of Mr. McDow. That was submitted on December 7.

THE COURT: Right, but that didn't include the video, right?

MR. PAUL: No, but it included an encounter that took place inside a building, the first time any mention going inside the building where the officers searched inside and so forth.

THE COURT: I see. Your point is that the defendant submitted his affidavit on December 4 or thereabouts. I guess it was filed in court December 7. He talks about an encounter in the building.

MR. PAUL: Correct.

THE COURT: Presumably that would have been known to the officers and the government at the time of the December 10 meeting?

MR. PAUL: Correct.

THE COURT: OK. I am going to return to the

government the copy of the affidavit they handed up along with the transcript. I'll try to decide the matter as quickly as I can.

Thank you.

(Adjourned)